John L. LEWIS, Henry G. Schmidt and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund, Plaintiffs,

v.

Harold A. MEARNS, Individually and Doing Business as Mearns Mining Company, Defendant.

No. 541–F.

United States District Court
N. D. West Virginia,
at Fairmont.

Dec. 5, 1958.

---

136

Harold H. Bacon and Charles L. Widman, Washington, D. C. (Val. J. Mitch, Washington, D. C., on the brief), and Louis D. Meisel, Fairmont, W. Va., for plaintiffs.

Howard Caplan and Stotler, McReynolds & Caplan, Clarksburg, W. Va., for defendant.

HARRY E. WATKINS, Chief Judge.

This is an action by the trustees of the United Mine Workers of America Welfare and Retirement Fund seeking 40¢ per ton royalties on 70,208.32 tons of coal mined by defendant, an operator of a small coal mining operation, between January 1, 1954, and November 6, 1956, or a total of $28,083.33, under a provision of the National Bituminous Coal Wage Agreement of 1950 as Amended September 29, 1952. This agreement is a collective bargaining contract entered into by the International Union, United Mine Workers of America (hereafter shortened to UMWA) and certain signatory coal operators and associations, including the defendant. The Fund of which plaintiffs are trustees is an irrevocable trust created by the 1950 Agreement pursuant to Section 302(c) of the Labor-Management Relations Act, 1947, commonly known as the Taft-Hartley Act, 29 U.S.C.A. § 186(c). Although the name of the Fund is similar to the name of the union, the Fund is actually a separate entity (in effect, a third-party beneficiary to the collective bargaining contract, see Lewis v. Benedict Coal Corporation, 6 Cir., 1958, 259 F.2d 346) with one trustee named by the union, one by the coal operators, and the third trustee a neutral party. Defendant admits having signed the contract in question here while aware of its contents, but denies liability on the ground that the agreement was void from the beginning because of fraud, and further urges that even if the contract were effective as to him that it was terminated September 1, 1955, when the UMWA and other coal operators entered into a new contract. This Court has jursidiction because of a diversity of citizenship between the parties.

1. The Defense of Fraud.

Having raised an affirmative defense, the burden of proof rests upon the defendant to show the fraud in the factum which he claims. I find that defendant has failed to carry the burden of proof on this matter. Taking into consideration all of the evidence and further considering the credibility of the witnesses, including their demeanor on the stand, their interest in the outcome of the case, if any, their ability to know the things about which they testified, and the reasonableness of their testimony, I find that there were no fraudulent representations made to, or relied upon by, defendant at the time of the execution of this collective bargaining agreement.

Defendant urges that there was fraud in the factum here in that he signed the contract only after a representation was made to him by the UMWA agents, upon which representation he relied, that the written contract was only a "formality" for the union's office records, whereas actually the contract between himself and the UMWA was an oral one including a provision that he need not necessarily pay the 40¢ per ton royalty. Defendant avers that he was told he could "pay what he could," that is, what he was financially able to pay; and since high operating costs in defendant's coal mining activities have made his business unprofitable, he alleges that he owes plaintiffs nothing. I must reject defendant's contention in this regard, however, under the overwhelming evidence to the contrary.

The representatives of the UMWA who dealt with the defendant with respect to his signing an agreement flatly deny ever telling the defendant that he need not pay the 40¢ per ton royalty called for in the

written contract. There is a direct conflict in the evidence in that respect, and I find the testimony of the UMWA representatives to be the more reasonable and credible evidence. The UMWA agents state that after being told by defendant that he felt unable to take on the added burden of 40¢ per ton royalty, they told defendant that the Welfare and Retirement Fund had in the past been very lenient with small coal operators in collecting the royalty, in not always demanding immediate payment when market or operating conditions were causing the operator to have "hard times." This leniency of the Fund is borne out in this case where, despite letters having been sent to the defendant almost monthly demanding payment, no legal action was taken against him until this suit was instituted August 2, 1957, for coal produced as far back as January, 1954. Some of defendant's testimony, and that of McCauley, his employee, can be reconciled with that of the UMWA representatives when considered in this light; but defendant was not told that he could pay what he could, or that he need *never* pay the full 40¢ per ton.

The welfare and retirement benefits provided by plaintiffs' Fund, including hospital and medical services, unemployment, retirement, death, and disaster benefits, are a vital part of the "fringe benefits" enjoyed by workers in the coal industry in this state. One cannot accept lightly a claim such as that made by the defendant here that the union agents negotiating a collective bargaining agreement would so casually waive payments to the Fund. The benefits to be received by miners from this Fund ranks, along with the scale of wages and amount of vacation pay, as one of the most important parts of the contract so far as the UMWA is concerned, and defendant's version of the statements made to him during contract negotiations is just unreasonable, under the circumstances. I find that the defendant has failed to show by a preponderance of the evidence that he was not to pay the 40¢ per ton royalty

payments to plaintiffs' Fund as called for in the written agreement.

Defendant's conduct subsequent to the signing of the contract is inconsistent with any other hypothesis except that he considered himself bound by the contract. The contract is dated January 1, 1954. Letters were sent by the Comptroller of the Welfare and Retirement Fund to the defendant on April 2, and May 6, 1954, demanding payment of royalty on coal produced since January 1, 1954. When no payment was forthcoming, the account was turned over to the Counsel to the Trustees of the Fund, who wrote defendant letters in June, August, September, October, November, and December, 1954, January and February, 1955, and April, 1956, urging him to liquidate his indebtedness incurred as a signatory to the National Bituminous Coal Wage Agreement of 1950 as Amended September 29, 1952. Defendant admits that these letters were received, that they worried him, that he was unable to pay his debt at that time, that he did not make any protest, but says that he thought the letters were only further formality.

On May 10, 1957, a representative of the Welfare and Retirement Fund visited the defendant and presented figures to indicate that defendant owed the Fund almost $10,000. That figure was apparently low because the Fund did not have knowledge of all of defendant's production until tonnage figures were provided by defendant in answer to interrogatories served upon him after the institution of this action. Defendant admitted liability to the Fund representative for the sum of almost $10,000, and proposed a plan of settlement if the Fund would wait a few months until defendant resumed mining operations in a new location. That proposal was reported to the Counsel to the Trustees, who found it unacceptable and so informed the defendant by letter of May 17, 1957, again reiterating the demand for payment of royalty on all coal produced. At no point during this entire period did the defendant make the slightest indication to the

Fund that he denied liability for 40¢ per ton royalty. It would seem that any reasonable person who did not consider himself bound by a written agreement would have protested vigorously to such demands.

Defendant, as well as all of his employees, became a member of UMWA on January 1, 1954, and made application to the Fund for a card entitling him, his wife and his son to free hospital and medical care to be paid for by the Fund. This card was issued by the Fund, and although no actual hospital or medical services were obtained by defendant or his family by reason of his holding this card, the mere possession of a valid card over a period of time is a valuable right, not unlike similar benefits offered by various insurance companies which are so popular today. Just how defendant can say that he was to pay the Fund no money, yet he and his employees were recipients of this valuable benefit from the Fund, is unexplained. At any rate, on August 4, 1954, defendant was notified by the Fund that because of his nonpayment of royalties this card was being cancelled. Again defendant made no protest, but mailed the card back to the Fund, even though (he now contends) he owed the Fund nothing.

Defendant availed himself of some of the provisions of the written contract during his operations from January 1, 1954, to November 6, 1956, despite his contention now that the written instrument was never effective. During this entire period he checked off union dues of his employees, in accordance with the requirements of the written contract, and forwarded those dues to the District Office of UMWA. On April 19, 1954, defendant filled out a UMWA grievance form for two employees he had discharged. This was a step in the procedure set up by the union under the section of the contract entitled "Settlement of Local and District Disputes." The union District representatives made an investigation of the grievance and upheld defendant's action. This is another in-

dication that defendant must have felt he was operating under the written contract.

■■ Under all the evidence, this Court, sitting without a jury, finds that there was no fraud present in the negotiations which ended in the written agreement in this case. At most, if defendant's testimony were to be believed, he has shown only a prior or contemporaneous oral agreement which he is barred from introducing here to vary the terms of the written contract by the parol evidence rule. In addition, the written agreement here was the final step in a collective bargaining process, under Section 8(d) of the Taft-Hartley Act, 29 U.S.C.A. § 158(d). It has been held that parties to such contracts are precluded by the Taft-Hartley Act from relying upon prior or contemporaneous oral agreements. Gatliff Coal Co. v. Cox, 6 Cir., 152 F.2d 52.

■■ If any fraud has been shown, it is fraud in the procurement of the contract and not fraud in the factum, and under West Virginia law, does not render the contract void, but only voidable. Jones v. Comer, 123 W.Va. 129, 13 S.E.2d 578. That being the case, if he wished to avoid liability the defendant here was under a duty to disavow the contract upon first learning that he had been defrauded into accepting the written agreement with UMWA. Defendant has failed to disaffirm that contract, although put on notice by the various letters mentioned above from officers of the Welfare and Retirement Fund. Section 483 of the Restatement of the Law of Contracts, subsection (1) states:

"The power of avoidance for fraud or misrepresentation is lost if after acquiring knowledge thereof the injured party unreasonably delays manifesting to the other party his intention to avoid the transaction."

In this case, not only has defendant waited an unreasonable time to disavow the contract, but he has actually ratified the contract. Section 484 of the same Restatement sets forth the principle that:

"The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it, * * *."

And in the *Comment* under Section 484, the following appears: "Intention to affirm may be manifested not only by words but by other acts." The actions of defendant set forth previously regarding his conduct subsequent to the signing of the contract constitute a manifestation of affirmance of the written contract, and in addition there is other evidence of benefits accepted by defendant by pretending to be operating under the written contract.

Although there is no question of duress in this case, that being an affirmative defense which was not raised by the pleadings here, there is evidence that the defendant was subleasing his tract of coal from a man named Evans, and was loading his coal at a tipple operated by Evans. During the negotiations with the UMWA agents, one of the union representatives told defendant that Evans, who had previously operated a non-union tipple, was signing a UMWA contract to conduct a unionized operation, and if the defendant did not also unionize his mine he could not dump his non-union coal at the unionized Evans tipple. Thus the defendant accepted a very real benefit under the written contract, for if he had openly refused to sign the contract because of his claimed inability to pay the 40¢ per ton royalty, he would have had to find a different tipple at which to load his coal, if in fact one could be found which was a non-union operation, and that would have been an expensive proposition. Judge Marsh has laid down the rule applicable here quite succinctly in his opinion in Lewis v. Cable, D.C.W.D. Pa., 107 F.Supp. 196, 197–198, a suit by the present plaintiffs against a coal operator for similar royalty payments:

"Defendant cannot by his acts and declarations pretend to be bound by the Agreement so as to prevent strikes and repercussions and then, when full liability under said Agreement is asserted, seek to disaffirm it."

Here the defendant led the UMWA, the Welfare and Retirement Fund, and his own employees to believe that he was operating his mine under a valid UMWA written agreement. Now, almost 4 years later, he sets up for the first time (in his answer in this case) the theory that no legal written contract exists. I find that even if there existed fraud in the procurement in this case, the defendant ratified the voidable contract by failing to disclaim it and by manifesting an intention to affirm the contract by accepting the benefits thereof.

Although the point has not been raised by counsel here, it is interesting to inquire whether the representations which defendant claims were made to him by the UMWA agents really constitute fraud. The general rule followed in almost all jurisdictions is set forth in 51 A.L.R. 49 as follows:

"* * * fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events."

Here it might well be argued that since the Fund is under altogether different management and control from the UMWA, any statements by the UMWA agents concerning defendant not having to pay any royalties would be mere speculative opinions or expectations regarding what future action might be taken by the Fund. But I do not consider it necessary to decide this question in view of the other findings I have made which are dispositive of the case.

Under no circumstances can the fraud in this case, if any there be, be called fraud in the factum because the defendant readily admits that he signed the written agreement with full knowledge of its contents, including the requirement of 40¢ per ton royalty. The contract of 1950, incorporated by reference in the 1952 Amendment, contains the provision that it "is an integrated instrument and

its respective provisions are interdependent \* \* \* " so defendant cannot urge that he was bound by some of the provisions of the written instrument and not bound by others. Under the evidence, I find that defendant is liable to the plaintiff for royalties of 40¢ per ton on all coal produced while operating under the 1952 agreement.

### 2. Termination of the 1952 Agreement.

The question then arises, under the defense raised here, when did this agreement of 1950, as amended in 1952, and signed by defendant effective January 1, 1954, terminate as to this defendant. The plaintiffs take the position that it is an open-end contract, continuing until one party thereto exercises the termination clause, which reads:

"This Amended Agreement dated September 29, 1952, shall be effective as of October 1, 1952, and is not subject to termination by any party signatory hereto prior to September 30, 1953, PROVIDED, HOWEVER, that either the parties of the first part [the coal operators] or the party of the second part [the UMWA] may, on or after September 30, 1953, terminate this Agreement by giving at least sixty (60) days' written notice to the other party of such desired termination date."

The parties agree that there has been no 60-day notice given by either the UMWA or the defendant here; indeed, defendant says that since the contract reads "parties" of the first part, he as an individual operator cannot take advantage of that paragraph. I disagree with that argument. There are multiple signatory operators and it is only natural to refer to them in the plural. I can see no reason why all those operators must act in concert to terminate the contract as to one operator. Each operator signed the contract as a party of the first part, many like the defendant here on dates subsequent to the effective date of the Amended Agreement, and each operator had the right to take advantage of the termination clause as to his individual operations

if he chose to do so. This view is consistent with the interpretation of the 1952 contract placed in the 1955 Amended Agreement, where the first paragraph states:

"Whereas on September 29, 1952, and at various dates subsequent thereto, certain coal associations, companies and individuals (generally referred to as 'Operators'), *in their* association, company and *individual names and capacities,* executed with the United Mine Workers of America an Agreement denominated 'National Bituminous Coal Wage Agreement of 1950 as Amended September 29th, 1952'; \* \* \*." (Emphasis added.)

Defendant was not asked to sign, and did not sign, the 1955 Amendment, but this paragraph indicates that those operators who did sign both the 1952 and 1955 agreements, and the UMWA, considered the "parties" of the first part to have been contracting in their individual capacities, and not as a collective group requiring group action. It would naturally follow that these operators can individually terminate their contract if they desire to do so.

Defendant contends further that inasmuch as the 1952 Agreement was only one of a series of collective bargaining agreements over the years between the UMWA and regional or industry-wide groups of coal operators, when the other operators signed the Agreement effective September 1, 1955, that the 1952 Agreement was terminated as to defendant. A reading of the 1955 contract refutes this argument, however, because the 1955 contract does not cancel the 1952 contract but specifically states that the terms and conditions of the 1952 contract are to be carried forward and preserved, with certain new amendments as to wages, amount of vacation pay, and a new date before which no termination could be demanded. Defendant having signed the 1952 contract, to be effective as to him on January 1, 1954, in his individual capacity as a party of the first part, and having failed to exercise the 60-day termination clause,

he cannot be relieved of liability under that contract because other operators and associations, in their individual capacities, amended their contracts with the UMWA.

I conclude that the 1952 Agreement remained in full force and effect between the defendant and the UMWA during the entire period January 1, 1954 to November 6, 1956, and that defendant is liable to the plaintiffs for 40¢ per ton on the entire 70,208.32 tons of coal produced during this period, or a total of $28,083.-33, the full amount sued for in this action.

The foregoing discussion includes all my findings of fact and conclusions of law in this case. Counsel may prepare a final order incorporating the views expressed in this opinion.