John L. LEWIS, Henry G. Schmidt, and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

BARNES CONTRACTING COMPANY, a corporation, Defendant.

Civ. A. No. 591–F.

United States District Court
N. D. West Virginia,
at Fairmont.

Dec. 29, 1959.

Louis D. Meisel, Fairmont, W. Va., and Val J. Mitch, Harold H. Bacon and John H. McManus, Washington, D. C., for plaintiffs.

Russell L. Furbee, Furbee & Hardesty, Fairmont, W. Va., for defendant.

HARRY E. WATKINS, Chief Judge.

This is an action by the trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950 seeking 40¢ per ton royalties on coal mined from certain tracts by defendant during the period beginning May 20, 1954, and ending January 31, 1959. Defendant is a general contractor who is also engaged in the mining of coal. The action arises under a provision of the National Bituminous Coal Wage Agreement of 1950 as amended effective October 1, 1952; September 1, 1955; and October 1, 1956. In each instance, the amendment carried forward the terms of the Agreement of 1950, as amended, and certain new amendments as to wages, amount of vacation pay, and other benefits. This agreement is a collective bargaining agreement entered into by the International Union, United Mine Workers of America and certain coal oper-

ators, of whom the defendant is one. The Fund of which plaintiffs are trustees is an irrevocable trust created by that Agreement pursuant to Section 302 (c) of the Labor Management Relations Act, 1947, commonly called the Taft-Hartley Act, 29 U.S.C.A. § 186(c). Although the name of the Fund is similar to the name of the Union, the Fund is actually a separate entity from the UM WA with one trustee named by the UM WA, one by the coal operators, and the third a neutral party. The Fund is, in effect, a third-party beneficiary to the collective bargaining contract. See Lewis v. Benedict Coal Corporation, 6 Cir., 1958, 259 F.2d 346; Lewis v. Mearns, D.C.N.D.W.Va.1958, 168 F. Supp. 134, 136, affirmed 4 Cir., 268 F. 2d 427.

This action was tried to the Court in lieu of jury. Jurisdiction vests in this Court inasmuch as defendant is a West Virginia corporation and each of the three trustees has citizenship diverse to that of the defendant.

A pre-trial conference was held, at which the issues were narrowed. These are not set forth because, at the trial, defendant admitted its indebtedness under the Agreement of 1950, as amended, in the amount of $10,544.98, while plaintiff claimed that $19,456.84 was the amount due. The parties stipulated as to the tons of coal mined under various leases between defendant and landowners, among other things. The parties agree that, if plaintiff's theory of this case is correct the sum due is $19,456.84 and if defendant's theory is correct, the amount due under the contract is $10,-544.98. These theories will be discussed and decided herein. There is a difference of $8,911.86 between the two figures, and the ultimate issue which must be decided by this Court is whether or not defendant is liable to plaintiffs for the greater or smaller of the two amounts.

The decision of this case rests upon the interpretation of the Agreement of 1950, as amended. The 1952 Amendment contains the following provisions:

"Application of Contract to
Coal Lands

"As a part of the consideration of this agreement, the Operators signatory hereto agree that this Agreement covers the operation of all of the coal lands owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this agreement) be put into production. The said Operators agree that they will not lease out any coal lands as a subterfuge for the purpose of avoiding the application of this agreement."

Defendant, by C. L. Barnes, its president, signed the Agreement as amended by the 1952 Amendment, on May 20, 1954. The Agreement was also signed by a representative of the UMWA on that date.

The Amendment of 1952, as well as those subsequent, also contained a space following the signatures of the party headed "List All Mines Covered by This Contract", and below that were sections for the listing of the name of the mine, its location, and the Local Union involved. There were several lines for the listing of different mines to be covered.

Plaintiffs contend that all mines operated by defendant during the term of the contract were covered by the Agreement and Amendments. Defendant, on the other hand, contends that only those mines which were listed in the space provided are covered, and that royalties are owed only for the coal produced at the listed mines.

This Court is not unmindful that the construction of a written instrument is to be taken most strongly against the party preparing it. See Henson v. Lamb, 1938, 120 W.Va. 552, 558, 199 S. E. 459, 461–462, and cases cited therein. Further, there is no doubt that basic contract law, as applied in West Virginia, provides that where there is a general provision in a contract, which also

contains a provision modifying or restricting the general provision, the modifying or restricting provision controls. See Mayle v. Criss, D.C.W.D.Pa.1958, 169 F.Supp. 58, 60; Bischoff v. Francesa, 1949, 133 W.Va. 474, 56 S.E.2d 865. In this regard, plaintiffs concede for the purposes of this suit that if defendant had been operating two different mines within the contract area of District 31, UMWA, at the time the contract was executed, and only one mine was designated as being covered by the contract, the restricting clause—"List all mines covered by the contract"—would be dominant and vary the "Application of Contract to Coal Lands" general provision, and only the designated existing mines would be covered. It has been stipulated, however, that defendant did not operate more than one mine or one operation at the date of execution of each of the contracts here involved, so this question as to existing mines is moot for purposes of this action.

The general provision provides that this Contract covers all coal operations "acquired during its term which may hereafter (during the term of this Agreement) be put into production". From a study of the Agreement of 1950 and relative amendments, this Court is of the opinion that the "List all mines covered by this contract" provision is a limitation only on the mines existing at the time, and does not apply to other operations acquired during the term of the Contract and thereafter put into production.

Defendant was engaged in the strip mining of bituminous coal. Such operation does not have a single location as in deep mining, but extends across surface lands, and when the operator exhausts the surface coal and comes to the end of the property he has leased, he must of necessity move the operation to another location. During the period herein involved, the defendant operated on twenty different leases within a radius of ten miles. The general provision in the Contract with reference to after acquired operations took care of this basic strip mining problem. The Agreement of 1950 was a continuing contract, and was expressly carried forward by each Amendment. At the time of the signing, it was not known or contemplated where the operation might next locate. It seems clear that it was not contemplated that a new contract would be signed each time a coal operator moved the site of his location during the pendency of the contract. This particular defendant did not become a party signatory to the Agreement of 1950 until the Amendment of 1952 (which contains the "Application of Contract to Coal Lands" general provision) was in effect. So far as the parties knew at the time defendant entered into the Agreement of 1950, as amended in 1952, that would be the entire contract between them. In other words, they were not aware that the 1955 and 1956 Amendments would ever be signed. From this, it seems clear that the fact that the 1955 and 1956 Amendments were signed is not an indication that separate contracts or agreements were contemplated for any after-acquired mines.

Parol evidence was allowed to determine if the intent of the parties was different from the conclusions stated above, and from this, as is shown below, it appears that defendant understood that the Agreement of 1950, as amended, would apply to all operations located in District 31, commenced subsequent to the execution of the contracts, whether listed or not.

The events which are pertinent to this case are that, on May 20, 1954, defendant entered into the Agreement by signing the 1952 Amendment, as stated above. The operation listed in the space provided was "Barnes Strip" located at "Pleasant Valley". In August of 1954, the coal on the leases at Pleasant Valley having been exhausted, defendant moved its operation to leases in the Kingmont, West Virginia, area. While conceding that the 1952 contract, signed in 1954, was in effect, defendant contends that the coal produced in the Kingmont area

was not subject to the payment of the 40¢ per ton royalty until September 1, 1955, on which date the 1955 Amendment became effective. This was signed by defendant on September 9, 1955, and listed the location of the covered mine as "Kingmont, W. Va." Defendant does not deny that royalties are due on coal produced in the Kingmont area beginning September 1, 1955. The parties agree that 13,153.20 tons of coal were produced in the Kingmont area from August, 1954, to September 1, 1955, which would result in an obligation of $5,261.28 owing plaintiffs by defendant if that production is considered as under the 1952 contract.

The remainder of the $8,911.86 in dispute stems from a different series of events. On March 15, 1957, defendant signed the 1956 Amendment, again by C. L. Barnes, its president. The UMWA was also a party signatory, and there is no contention that any of the Amendments (sometimes referred to as though they were separate contracts, for the purposes of clarity) were invalid. In actuality, defendant entered into two of the 1956 Amendments, but only one of these is pertinent here. In the one pertinent, signed on March 15, 1957, the name of the mine covered is listed as "No. 2" located at Laurel Point.

Later in 1957, coal on the Laurel Point leases was exhausted and defendant's operations were moved to an area in Clay District of Harrison County, West Virginia. Defendant urges that all coal produced after its Laurel Point leases were exhausted and it moved its operations to the Clay District, Harrison County, was not produced under the terms of the 1956 contract, although admitting the 1956 contract had not been terminated. The parties agree that the coal so produced amounted to 9,126.46 tons and that if this coal were produced under the 1956 contract, then in effect the resultant royalty obligation would be $3,650.58. Thus, royalties on the coal produced in the Kingmont areas during the stated times and that produced in the Clay District area are the only royalties which are now in dispute.

Defendant mined several areas during the period May 20, 1954, to and including January 31, 1959. Of those, the only ones in which the royalties are in dispute are the two mentioned above. Throughout the course of this time, it appears that defendant was at times in arrears in its payments to the Fund. Plaintiffs introduced in evidence six letters from the Fund or its counsel to defendant, the first dated December 10, 1954, and the last dated July 15, 1958. Defendant made prompt reply to each of these letters, and nowhere denied owing the amounts of money claimed by plaintiffs in the letters, and made no mention of any coal being produced which it considered without the contracts here involved. Defendant did not deny owing welfare royalties to the Fund in any of the letters, except one in which it was stated that no coal had been produced for a certain period. As late as July 28, 1958, defendant wrote the Fund, "We are now loading coal and we will pay the welfare as we get paid for the coal." This letter was written during a time when substantial coal which defendant claims was not within the contract was being produced.

Since the letters did not detail the coal on which royalties were demanded, the correspondence cannot be considered as conclusive, but it would certainly seem that defendant would inform plaintiffs that it was producing coal on which no royalties were due, so as to keep its accounts straight. The following statement by this Court in a prior action in which these same trustees sued for the same type royalties would certainly seem apropos, at least by analogy, in the present case. In the prior case, Lewis v. Mearns, supra, this Court said at page 138 of 168 F.Supp.: "It would seem that any reasonable person who did not consider himself bound by a written agreement would have protested vigorously to such demands." Analogously, it would seem, in the present case, that if defendant had not considered itself bound

to pay the royalties now disputed, it would have so protested to defendants.

There is other evidence which throws more light upon the understanding of defendant as to whether or not the disputed areas were considered as falling under the contract. Detailed statements of coal produced at the various mines are in evidence, as are statements of the amounts paid by defendant to plaintiffs for welfare royalties. During November and December of 1954, which is within the time during which defendant claims no royalties were due plaintiffs on coal produced in the Kingmont area, the only coal being produced by defendant was from the Kingmont area. In November, 1954, defendant produced 184.81 tons, and during December produced 188.32 tons. Defendant paid plaintiffs royalties at 40¢ per ton on 184 tons and 188 tons for November and December respectively.

Further, the following tonnages are listed by defendant in its answers to interrogatories as having been produced at Carolina from June, 1958, to November, 1958. (This coal, or the greater amount of it, was actually produced in Clay District of Harrison County, which is an area that defendant claims was not covered by the 1956 contract):

| Period | Tonnage |
|---|---|
| June 1958 | 291.40 tons |
| July 1958 | 1,197.10 tons |
| September 1958 | 1,910.20 tons |
| October 1958 | 1,504.43 tons |
| November 1958 | 1,200.70 tons |

The royalty payments by defendant to plaintiffs, and the tonnage reported by defendant, correspond to the last decimal point for each of those months, all of which are in a time period, and for an area which defendant claims is not covered by the contracts.

At the trial, defendant's president, C. L. Barnes, attempted to explain the above by saying that these were payments on past due royalties on coal produced under mines covered by the contract, but this explanation is not corroborated by other evidence in the case.

It is true that defendant was behind in payments on other welfare royalties, but the fact that the amount due at 40¢ per ton on each month's production was exactly the same as the royalties actually paid for the above months would not seem to be coincidental.

Throughout the entire period involved here, defendant "checked off" union dues of its mining employees, and forwarded these dues to the UMWA, as required under the agreement. Various employees were granted benefits by the Fund, some during the two periods during which defendant claims that it was producing no coal subject to welfare royalties. It is most certainly inconsistent of defendant to claim that no royalties were due the Fund, while at the same time its employees were receiving benefits thereunder. This Court was of that opinion in Lewis v. Mearns, supra, and the same applies to the present case.

Defendant contends that the specific provision of listing mines should prevail over the general contract provision which includes within the contract all future lands acquired by the defendant. It relies primarily on Henderson Development Co. v. United Fuel Gas Co., 1939, 121 W.Va. 284, 3 S.E.2d 217. This was a case in which plaintiff sought specific performance of a contract to lay a pipe line to plaintiff's gas well in Teays Valley District, Putnam County, W.Va., and to require defendant to take and pay for the gas produced therefrom. The gas well in question was some eight miles distant from the original development of the plaintiff which was being operated at the time of the contract between plaintiff and Charleston-Dunbar Natural Gas Company, from whom United Fuel purchased the assets and assumed the liabilities owned by Charleston-Dunbar. The gas company agreed to run gas lines to and purchase gas from plaintiff's wells located in Putnam and Lincoln Counties, West Virginia.

The contract provided the manner in which the pipe lines were to be constructed, and further provided that plaintiff should develop the lands on

which it held leases radiating successively from a Gathering Station in a manner known as "Location by Location" unless some other method was required or necessary under the terms of the leases.

In discussing the Henderson case, the West Virginia Court said, at pages 218–219 of 3 S.E.2d:

"."A cursory examination of the contract in the instant case indicates that a methodical development of the gas properties is contemplated, and that, as so developed, the utility will make all necessary connections and take the gas produced thereby, in accordance with the terms of the contract.

"In the first place, the expression 'extended line' is in the singular and 'gathering lines' in the plural, and the contract clearly indicates an intention to connect all 'gathering lines' into the 'extended line' at the 'junction point'. This being so, most pertinent becomes the clause providing that the distance between wells shall not be less than 2,000 feet. and further providing that the properties shall be developed 'by drilling said wells radiating successfully, as far as practical, from the said Gathering Station in a manner commonly known as "Location by Location" * * *.' Of course, the word 'successfully' does not make sense in the clause and clearly 'successively' was the word intended, which should be substituted in the interest of justice. [Citations omitted] What is meant by this clause of the contract appears from the testimony of the former secretary of the Charleston-Dunbar Company. He stated, in effect, that the contract contemplated the successive drilling of wells from the 'extended line' in successive locations. His testimony, though illuminating, is not necessary to persuade us that the contract readily lends itself to this interpretation. No other interpretation, we suggest,

is reasonable under the circumstances and the plain meaning of the words. * * * It seems clear from the foregoing that the contracting parties never intended to include a well eight miles distant from, and without intervening development connecting it with, the original development."

The West Virginia court then proceeded to uphold the action of the circuit court in dismissing plaintiff's suit.

There is no doubt that the outcome of the Henderson case was correct, as applied to the circumstances there present. However, an entirely different set of circumstances prevails here. In the Henderson case, as shown above, a plan for methodical development of a gas field was part and parcel of the contract and the geographic area in which the contract was to be of effect was necessarily controlled by the distance that the wells radiated successively from the original development. This seems entirely proper, since gas pipe lines must form interconnecting arteries to be of any benefit whatsoever.

The same is not true of coal operations as carried on by Barnes. The only geographic limitation as to after-acquired lands was that they be in the confines of District 31, UMWA. No plan of development is mentioned in the contracts. The facts in the present case are such as to require a holding that the parties herein intended that the Agreement as amended would apply to after-acquired lands. This finding is not contra to that of the Henderson case. It is simply that the different circumstances present in this case and the Henderson case required different findings. In the Henderson case, the Court stated:

"A cardinal rule in the construction of a contract is that its main object, or the purpose which the parties sought to accomplish, is to be considered in ascertaining their intention, and particular parts of the contract must be so construed as to harmonize with such purpose, if possible."

It is the conclusion of this Court that the coal mined from the Kingmont area during the period from August, 1954, to September 1, 1955, as well as the coal mined in Clay District of Harrison County, West Virginia, is subject to the payment of the welfare royalty at 40¢ per ton. Under the facts and circumstances, taking into account the credibility of the witnesses, the interest of the parties, the reasonableness of the contentions raised, and all other pertinent factors, this Court must conclude that defendant understood and agreed that the mining operations in dispute were subject to the 1950 Agreement, as amended, and welfare royalties in the amount of $19,456.84 are due plaintiffs by defendant.

The above discussion is adopted as the findings of fact and conclusions of law of this Court. Counsel may prepare an order incorporating the views expressed in this opinion.