John L. LEWIS, Henry G. Schmidt and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

SPLASHDAM BY–PRODUCTS CORPORATION, a corporation, Defendant.

Civ. A. No. 1034.

United States District Court
W. D. Virginia,
Abingdon Division.
July 14, 1964.

Clyde Y. Cridlin, Jonesville, Va., Val J. Mitch, Harold H. Bacon, Joseph T. McFadden, Washington, D. C., for plaintiffs.

William H. Woodward, Jones, Woodward, Miles & Greiner, Bristol, Va., Henry D. Stratton, Pikesville, Ky., for defendant.

DALTON, Chief Judge.

This action is brought by John L. Lewis, Henry G. Schmidt, and Josephine Roche, the Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, against Splashdam By-Products Corporation. The plaintiffs seek to recover certain royalty payments allegedly due under the terms of a collective bargaining agreement executed between the defendant mining corporation and the United Mine Workers of America, representing defendant's employees. The complaint alleges that under the provisions of the agreement, known as the National Bituminous Coal Wage Agreement of 1950, as amended, effective December 1, 1958, executed between the said parties on February 1, 1959, the defendant was required to pay to the Welfare Fund the sum of forty cents per ton on each ton of coal produced for use or for sale. The complaint further alleges that during the period February 1, 1959 through August 31, 1962, the defendant produced approximately 280,596.86 tons of coal, whereby there became due to the Welfare Fund the sum of $112,238.74; that the defendant corporation made payments in the amount of $59,720.96; and that the amount due and owing to the plaintiffs is $52,517.78 which sum the plaintiffs have demanded and the defendant has refused to pay. Plaintiffs seek recovery of this amount, with interest, together with an additional sum of forty cents per ton of coal produced by the defendant in excess of 280,596.86 tons for the period February 1, 1959 through August 31, 1962, with interest and costs.

The defendant answered the complaint admitting the execution of the agreement on February 1, 1959, but alleging that the union did not represent a majority of defendant's employees eligible to be represented by the said union at the time the agreement was executed. The defendant contends, therefore, that the agreement is void and unenforceable in that its execution constituted an unfair labor practice of the union under § 8(b) (1) (A) of the National Labor Relations Act (29 U.S.C.A. § 158(b) (1) (A), and unfair labor practice of the defendant under § 8(a) (1) and (2) of the Act (29 U.S.C.A. § 158(a) (1), (2)); all in contravention of the rights guaranteed to employees under §§ 7 and 9 of the Act

(29 U.S.C.A. §§ 157, 159). For these same reasons the defendant also counterclaims, seeking judgment against the plaintiffs in the amount of $59,720.96, with interest, the total amount paid to the plaintiffs from time to time by the defendant, such payments having been allegedly made under the mistaken belief that the agreement was valid and enforceable.

By way of a second defense the defendant raises the point that even if the contract is valid, those mines of the defendant put into operation for the first time subsequent to the execution of the contract and not shown on the face of the agreement as "mines covered by this contract", would not be subject to its provisions.

The defendant also questions the jurisdiction of the Court based on a lack of diversity of citizenship. Splashdam By-Products Corporation is incorporated under the laws of Virginia and for diversity purposes is a citizen of that state. It is alleged that the plaintiff, John L. Lewis, who presently resides in Alexandria, Virginia, is also a citizen of Virginia, thus, defeating diversity jurisdiction in this case. Lewis filed an affidavit (Exhibit 7(a)), in which it is stated that he has remained a citizen of the State of Illinois, having maintained his residence there since 1908. He also states that he is a registered voter in Illinois and has voted there since 1909; that he pays real and personal property taxes there; that he has maintained a residence in Alexandria, Virginia, since he came to Washington, D. C. in the mid-1930's by reason of his duties as president of the United Mine Workers of America; that he has paid taxes in accord with the laws of Virginia but has never registered to vote or voted in any election in Virginia; that he is presently Chairman of the Board of Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950; and that it is, and always has been, his intention to return to and resume his residence in Illinois. Defendant contends, however, that Lewis has shown his intent to become a citizen of Virginia by making his home in Alexandria for an indefinite period of time, having remained in Virginia approximately thirty years.

The test of citizenship for diversity purposes is that of domicile. Ellis v. Southeast Constr. Co., 260 F.2d 280 (8th Cir. 1958). The determination of domicile is a mixed question of law and fact depending on two elements: (1) presence of one within the state, and, (2) the intent to make his home within the state and remain there, thus abandoning any prior domicile. A change of residence occasioned by the exercise of duties in connection with some particular office such as that held by Lewis upon his coming to Washington, would not result in a new domicile unless such change was accompanied by an intention to abandon the old domicile in Illinois. See, Sweeney v. District of Columbia, 72 App.D.C. 30, 113 F.2d 25, 129 A.L.R. 1370 (1940). John L. Lewis, having declared his present and past intention to return to Illinois, has expressed an intent to retain his domicile in that state and, thus, his residence in Virginia for official purposes would not defeat diversity jurisdiction in this case.

The status of Lewis in this instance is somewhat akin to that of congressmen, government officials and others who go to the Capitol at Washington, D. C., and live in Virginia and Maryland for convenience in the performance of their work, and who have no intention of permanently abandoning citizenship in their own state. Therefore, defendant's motion to dismiss on lack of diversity of citizenship is overruled and denied.

On the basis of all the pleadings and interrogatories filed in the action, together with the affidavits and exhibits attached thereto, the plaintiffs move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., in the amount of $116,550.02, and as to defendant's counterclaim on the grounds that there is no genuine issue of fact and that plaintiffs are entitled to judgment as a matter of law.

By answer to interrogatories and supplemental interrogatories the defendant shows the total coal production of all the mines operated by it for the period February 1, 1959 through August 31, 1962, to be as follows:

| Mine Number | Tons of Coal Produced | |
|---|---|---|
| 1 | 1,901.20 | |
| 2 | 10,276.25 | |
| 3 | 18,086.75 | |
| 4 & 5 | 49,567.70 | |
| 6 | 85,043.33 | |
| 7 | 20,513.60 | |
| 8 | 18,271.50 | |
| Total, mines 1 through 8 .......... | | 203,660.33 |
| 9 | 50,052.80 | |
| 10 | 76,922.45 | |
| 11 | 19,282.75 | |
| 12 | 40,148.42 | |
| 13 | 20,102.50 | |
| 14 | 11,251.76 | |
| 15 | 11,700.17 | |
| 16 | 7,556.26 | |
| Total, mines 9 through 16 ............. | | 237,017.11 |
| Total production for period, all mines ............... | | 440,677.44 |

Based on these production figures, assuming the contract to be valid, the defendant incurred a total liability to the Welfare Fund of $176,270.98. Of this amount, both parties agree that the defendant has paid $59,720.96. Thus, if the contract is valid and if the entire production of Splashdam is subject to the contract, the amount of the debt owing is $116,550.02.

The principal issue raised in this case is whether an attack can be successfully made on the validity of a collective bargaining agreement in a federal district court on the ground that the execution of such contract constitutes an unfair labor practice under the national labor acts. Counsel for the defendant ably maintains that the Court has jurisdiction to uphold the national labor policy declared by the Congress in the labor act, that it is unlawful for a union to be recognized as an exclusive representative in bargaining for employees when it does not represent a majority of them. Defendant finds support for this proposition in International Ladies' Garment Workers Union v. N.L.R.B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), which held that a collective bargaining agreement containing recognition of the union as an exclusive bargaining representative executed between an employer and a union which did not represent a majority of the employees, was void. The court stated there that the unlawful genesis of the agreement precluded its partial validity. The line of reasoning advanced by the defendant, however, tends to confuse the question of the correctness of the legal proposition that where an unfair labor practice is found in the execution of a collective bargaining agreement with a minority union such contract is void, with the question of the jurisdictions of the district courts to find such an unfair labor practice. The legal proposition advanced

may be correct. But stating the proposition in terms of national labor policy does not change the initial inquiry of whether or not the courts have been vested with jurisdiction to deal with the problem. Can the district court make a valid finding that an unfair labor practice has been committed? Are the district courts competent to give binding remedial effect to such a finding? These are questions which must be answered before the Court can give effect to the defense sought to be raised by the defendant. This Court is of the opinion that the questions must be answered in the negative. Where the problem has arisen it has been uniformly held that the courts are not competent to find the commission of an unfair labor practice and that they cannot give effect to such finding. See, Local 207, Int'l Ass'n of Iron Workers' Union v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963); Marine Engineers Beneficial Ass'n v. Interlake S.S. Co., 370 U.S. 173, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962).

"Congress has vested jurisdiction to determine which activities are unfair labor practices within the meaning of the National Labor Relations Act, as amended, in the National Labor Relations Board and not in the United States District Courts." Holman v. Industrial Stamping & Mfg. Co., 142 F.Supp. 215, 218 (E.D.Mich.1956)

"It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged." International Ass'n of Machinists, etc. v. N. L. R. B., 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940).

■ The fact that this is a case in which an unfair labor practice is sought to be recognized as creating a legal defense rather than a case in which relief is affirmatively sought to remedy the consequences flowing from an unfair labor practice would not detract from the applicability of the rationale of these cases to the facts before us.

The problem has arisen in suits for the breach of a collective bargaining agreement under § 301 of the Labor Management Relations Act (29 U.S.C.A. § 185) where the Fourth Circuit has held that the district courts have no right to grant relief with respect to conduct which would be, if established, an unfair labor practice within the exclusive jurisdiction of the Board, but the courts do have jurisdiction to grant relief with respect to an alleged breach of contract even though the conduct involved might also constitute an unfair labor practice. Textile Workers Union v. Arista Mills Co., 193 F.2d 529 (4th Cir. 1951). Thus, the district courts can give relief with respect to conduct which constitutes an unfair labor practice but they should not give legal effect to the occurrence of an unfair labor practice as such. See also, Amazon Cotton Mill Co. v. Textile Workers Union, 167 F.2d 183 (4th Cir. 1948), where the Court said:

"It is perfectly clear, both from the history of the National Labor Relations Act and from the decisions rendered thereunder, that the purpose of that act was 'to establish a single paramount administrative or quasi-judicial authority in connection with the development of federal American law regarding collective bargaining'; that the only rights made enforceable by the act were those determined by the National Labor Relations Board to exist under the facts of each case; and that the federal trial courts were without jurisdiction to redress by injunction or otherwise the unfair labor practices which it defined. * * * There is nothing in either the text or the history of the Labor Management Relations Act to indicate any departure from this salutary approach to the matter of conferring jurisdiction on the courts in labor controversies. * * * [T]here is no indication of any in-

tention to change the method by which unfair labor practices were dealt with under the act or to vest the District Courts with jurisdiction as to these matters, except to the limited extent that such jurisdiction was expressly conferred." 167 F.2d at 186.

The second defense raised by the defendant is that the coal production in those mines which were not opened until after the signing of the contract should not be controlled by the provisions of the contract and, therefore, should not be subject to the Welfare Fund Royalty payments. One of the provisions in the contract states: "List all Mines covered by This Contract." In the blank spaces under this provision there appears a listing of defendant's mines, Nos. 1 through 8. On February 1, 1959, at the time of the execution of the contract these eight mines, all located in the area of Big Rock, Virginia, constituted the entire productive efforts of Splashdam. Subsequently, eight additional mines were put into operation by the defendant and some of the original eight were shut down. The defendant contends that the contract does not obligate it to make royalty payments based on the coal production in mines 9 through 16 since the contract would not be applicable to those mines which were put into operation for the first time subsequent to the execution of the agreement, and since they were not listed on the face of the agreement. On the other hand, the plaintiffs contend that these mines would be made subject to the operation of the contract by the "Application of Contract to Coal Lands" clause, appearing in the National Bituminous Coal Wage Agreement of 1950, as amended September 29, 1952, and incorporated by reference into the agreement signed by these parties. This clause provides, in material portion, as follows:

"As a part of the consideration for this agreement, the Operators signatory hereto agree that this Agreement covers the operations of all of the coal lands owned or held under lease by them, * * * or acquired during its term which may hereafter (during the term of this agreement) be put into production."

Viewing only this clause, it would appear that any mine, whether or not owned or controlled by the operator at the time the contract was executed, would be subject to its terms. But a different result may arise when this clause is viewed in context with the provision for listing all the mines covered by the contract. Clearly, the terms of the contract would not be applicable to mines in operation at the time of the execution of the contract and not listed as covered by the contract in the spaces provided therefor. To apply the contract under these circumstances would be to ignore the restrictive effect to be found in the "List All Mines Covered by this Contract" provision. Lewis v. Barnes Contracting Co., 179 F.Supp. 673 (N.D.W.Va.1959). In the Barnes case the court, in construing the two clauses here involved, stated:

"From a study of the Agreement of 1950 and relative amendments, this Court is of the opinion that the 'List all mines covered by this contract' provision is a limitation only on the mines existing at the time, and does not apply to other operations acquired during the term of the Contract and thereafter put into production." 179 F.Supp. at 675.

In that case the plaintiff trustees conceded that if two mines were in operation at the time the contract was executed and only one of the two was designated as being covered by the Contract, the restricting clause "List All Mines Covered * * *" would be dominant and vary the "Application of Contract to Coal Lands" general provision, and only the designated existing mine would be covered.

In the instant case, Walter Brown, the President of Splashdam By-Products Corporation, stated in an af-

fidavit filed by him that the corporation owned none of the land on which its mining operations were conducted. Nor was such land held under written leases. He stated that all of the operations of Splashdam were conducted on lands owned or controlled by the Buchanan County Coal Corporation, such operations of Splashdam being in the nature of secondary recovery mining in areas which had been left partly unmined or which had been completely by-passed by Buchanan. The operations of Splashdam were initiated only upon verbal permission of the Buchanan officials who indicated the areas in which Splashdam was to mine by map notations. Since none of the mines, Nos. 9 through 16, were in operation at the time the contract was signed it appears that the limitation in the application of the contract enunciated in the Barnes case would not apply in this circumstance. The defendant's operations were conducted upon lands held under oral leases. Whether the leases necessary to operate these mines were obtained before or after the execution of the agreement would not be material since in either event the language of the Application of Coal Lands clause would be operative:

> " * * * [T]his agreement covers the operation of all of the coal lands owned or held under lease * * * or acquired during its term * *."

It must be concluded as a matter of law that the contract is applicable to the production from all sixteen mines operated by the defendant.

The Court, having carefully examined the entire record, is of the opinion that there is no material fact upon which reasonable minds could differ or from which varying inferences could be drawn. Therefore, the plaintiffs' motion for summary judgment must be granted, and an order will be entered dismissing the defendant's counterclaim, and granting judgment in favor of the plaintiffs against the defendant for the sum of $116,550.02 plus interest from the date of judgment and costs.