**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL HOD CARRIERS', BUILDING AND COMMON LABORERS' UNION OF AMERICA, LOCAL 300, AFL-CIO, Respondent.**

No. 16732.

United States Court of Appeals Ninth Circuit.

March 15, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Rosanna A. Blake and Robert Sewell, Attys., N. L. R. B., Washington, D. C., for petitioner.

Alexander H. Schullman, Los Angeles, Cal., for respondent.

Before ORR, HAMLIN and JERTBERG, Circuit Judges.

ORR, Circuit Judge.

The National Labor Relations Board, hereafter the Board, entered its order adjudging International Hod Carriers', Building and Common Laborers' Union of America, Local 300, AFL–CIO, hereafter the Union, guilty of violating Sections 8(b) (1) (A) and 8(b) (2) of the

National Labor Relations Act, 29 U.S. C.A. § 158(b) (1) (A), (b) (2).[1] We are asked by the Board to enforce said order. The Board adopted the findings of the Trial Examiner, which are to the effect that the Union unlawfully caused Martin Bros., an employer doing contracting work, to discharge employees Monico Garcia and Jesse Gallego because said employees had failed to adhere to the Union's internal rules governing job referral.

The Trial Examiner found in substance the following facts: That in April, 1958, Martin Bros. was engaged in a construction project known as the Wilshire Terrace job. On Friday, April 18, Garcia and Gallego, both Union members, went to the project on their own volition and were hired as laborers by Arthur Sherman, Martin Bros.' foreman. At the time the two men reported for work the next Monday respondent's assistant business agent was on the scene; he ascertained that these men had not received clearance through respondent's hiring hall to work on this job, and he then told foreman Sherman that "these men have to get off the job because they have no clearance for the job." Sherman thereupon told the two men to report to the hiring hall, get a clearance and come back. However, at the hiring hall they were refused clearance and told they would be required to list their names on the referral board and await their turn. About seven weeks later the two men did go back to work at the Wilshire Terrace job pursuant to the dispatch system; during the interim they made two attempts on their own initiative to obtain reinstatement but were refused work by foreman Sherman because they did not have a clearance.

The hereinbefore related facts on their face indicate a violation of § 8(b) (1) (A) and (b) (2) of the Act, in that from these facts it could be deduced that the Union interfered with the right of employees to refrain from performing union duties, and thereby encouraged obedient union membership. Radio Officers' Union, etc. v. N. L. R. B., 1953, 347 U.S. 17, 39 ff., 74 S.Ct. 323, 98 L.Ed. 455; Morrison-Knudsen, Inc. v. N. L. R. B., 9 Cir., 1959, 270 F.2d 864. However, the Union alleges the existence of a valid hiring hall agreement between itself and Martin Bros., which would negative the asserted invalidity of its actions. N. L. R. B. v. Mountain Pacific Chapter of Associated General Contractors, 9 Cir., 1959, 270 F. 2d 425.

The Union is divided into two categories—plaster tenders and laborers; it negotiates separate collective bargaining agreements for the two divisions; with respect to its laborers it bargains (and contracts) through the Los Angeles Building and Construction Trades Council, a bargaining organization which negotiates contracts with employers on behalf of all its member unions as a group. In 1946 W. L. Martin, a partner in Martin Bros., entered into such a contract with the Los Angeles Council and the building and trade councils of eleven other southern California counties. The contract is a short, one-page document entitled "Articles of Agreement", and contains the following relevant provisions:

"The Contractor does hereby agree and affirm that he will employ or cause to be employed upon any and all work which comes under the jurisdiction of the Councils * * * only members in good standing in the organization to which said work properly belongs in accordance with the wage scales, classifications and working rules of the Union having jurisdiction.

"The Contractor further agrees that before starting said work * * he will contact the Council in the jurisdiction where the work is to be performed and will comply with the

---

1. These sections in effect make it illegal for a union to interfere in any way with the rights granted under Section 7 of the Act, 29 U.S.C.A. § 157, which says every employee shall have the right to join or to refrain from joining a labor union.

608

requirements of the Council and its affiliated Unions for clearing workmen to the job before said workmen are put to work thereon.

\* \* \* \* \* \*

"This agreement shall become effective at the date hereof and remain in full force and effect for a period of one year and from year to year thereafter, unless either party has given sixty (60) days written notice to the other party, prior to the termination date, that it desires to terminate, amend or modify said Agreement."

The Union asserts that this contract is a "short form" agreement which incorporates, and continues to incorporate during its existence, the current master contract which the Building and Construction Trades Councils have with the Associated General Contractors (AGC), a bargaining association of employers. The agreement itself is absolutely silent as to the existence or incorporation of such a master contract, and to attempt to enlarge its terms by parol testimony would be a violation of the parol evidence rule.[2] However, the agreement does refer to "the wage scales, classifications and working rules of the Union having jurisdiction", and "the requirements of the Council and its affiliated Unions for clearing workmen to the job", and it appears that respondent's wage scales, working rules and clearing requirements are those set out in the AGC contracts, including a requirement that employers hire new laborers through respondent's hiring hall.

At the time W. L. Martin signed this agreement he was doing business as "W. L. Martin, Contractor"; he testified that he signed the agreement because he was then doing some general contractor work, whereas his normal business both before and since then has been that of a lathing and plastering contractor. Subsequent to the signing of the agreement, "W. L.

Martin, Contractor" was replaced by "Martin Bros.", a partnership composed of Mr. Martin and his brother. Martin Bros. has continued to carry on the lathing and plastering business and has also maintained the general-contracting license. In its work it employs both laborers and plaster tenders, which are respondent's two divisions. Martin Bros. has joined the Contracting Plasterers' Association, another association which bargains collectively for its member employers; this Association has a contract with respondent as to plaster tenders but has entered no agreement with respondent as to laborers. It is the Union's contention that as to laborers Martin Bros. is still bound by the 1946 agreement which W. L. Martin entered into with the Los Angeles Building and Construction Trades Council. The Trial Examiner disagreed with this contention.

The 1946 agreement provides that it shall remain in effect until either party gives notice of intent to terminate. No such notice has ever been given. Neither partner in Martin Bros. has ever either expressly affirmed or denied that the partnership considers itself bound by the contract. W. L. Martin testified he thought he was only signing an agreement to be bound for the duration of the term of the then current AGC contract, but this is contrary to the unlimited time provided for by the agreement itself. Joseph D'Amico, respondent's business representative, testified that respondent has considered the agreement as being in effect ever since 1946 and has operated thereunder since that time. It is admitted that Martin Bros. has at all times conformed to the agreement's wage scale provisions: it has paid its laborers the wages called for by each current AGC contract, and it has made monthly health and welfare benefit payments on its laborers since the AGC contract was amended in 1955 to provide for such payments. Mr. D'Amico testified that

2. Under Section 10(b) of the National Labor Relations Act, 29 U.S.C.A. § 160(b), the Board and its trial examiners are not strictly bound by the rules of evidence used in the district courts, but as we read the record the Trial Examiner did not elect to do away with the parol evidence rule here.

shortly after said amendment of the AGC contract Martin Bros. called respondent and asked to be sent the necessary forms for paying into this fund. The Union's business records showing Martin Bros.' payments were introduced and it was explained that the Union does not accept payments into this fund from any employer who has not signed a contract with it.

Relative to hiring employees, W. L. Martin testified that Martin Bros. has sometimes called the hiring hall and at other times has hired men as they come around looking for work or are referred by someone working on the job. However, Mr. D'Amico testified that on two previous occasions when it had come to his attention that Martin Bros. was hiring men who did not have hiring hall clearances he had contacted one of the Martin brothers and told them they were violating their agreement, and in each case the laborer involved had been taken off the job (as were Garcia and Gallego in the instant case). This testimony was not contradicted, and W. L. Martin admitted that he and his representatives had from time to time spoken with the Union's representatives concerning laborers.

The Trial Examiner in his report stated in part:

"To sum up, a preponderance of the evidence supports the claim of the General Counsel that there was no contract or contractual arrangement between Martin Bros. and Respondent Union covering the dispatch of laborers. The only evidence of a contract, aside from the contributions to the health and welfare fund, is a one-page short form document signed in 1946 by the predecessor of Martin Bros., whereby the predecessor agreed to maintain an illegal closed shop in his dealings with the six basic trades which were members of the Building Trades Council.

"Obviously, this one page document which sets forth no wages, rates of pay, hours of employment or customary terms and conditions of employment does not rise to the stature of a collective bargaining agreement, particularly so 12 years after its signature by a different employer. Merritt-Chapman & Scott, 118 N.L.R.B. 380, 382. Furthermore it goes beyond the limited union shop permitted under the Radio Officers decision, supra. And considering it under the Board's Mountain Pacific doctrine, supra, that the hiring hall is sui generis and to be evaluated under its own criteria, the record does not disclose that Respondent has met the three requisites of the Mountain Pacific decision."

We are convinced that the record before us and the law established by past decision of the courts and the Board do not support the above conclusions, which were adopted by the Board as the basis for its order.

Section 8(d) of the National Labor Relations Act requires union and management to confer in good faith with respect to wages, hours and other terms and conditions of employment, and to place into a written contract "*any* agreement reached". 29 U.S.C.A. § 158(d). (Emphasis added). The Board very early decided that this Act gives it no power to determine what an agreement must contain to be a valid agreement. "The Board has no power under the Act to decide upon the subject matter or substantive terms of a union agreement. * * * By the Act, the terms of agreement are left to the parties themselves; the Board may decide whether collective bargaining negotiations took place, but it may not decide what should or should not have been included in the union contract." Consumers' Research, Inc., 2 N.L.R.B. 57, 74 (1936). We are unable to follow the Trial Examiner's reasoning that the 1946 agreement signed by W. L. Martin and the Los Angeles Building & Construction Trades Council did not rise to the stature of a collective bargaining agreement merely because it did not spe-

610

cifically set forth wages, hours and other normal terms of employment. Merritt-Chapman & Scott Corp., 118 N.L.R.B. 380 (1957), cited by the Trial Examiner, and Consolidated Western Steel Corp., 108 N.L.R.B. 1041 (1954), which preceded Merritt-Chapman & Scott Corp., only say that such an agreement is not a collective bargaining agreement for purposes of a particular statutory exception to the unfair labor practices provisions of the Act. See Section 102 of Labor Management Relations Act, 1947, 61 Stat. 136, 152 (1947), 29 U.S.C.A. § 158 note. They do not hold that such an agreement is not, in all other respects, a valid and binding labor-management contract.

It is common practice for union contracts to have automatic renewal provisions similar to the one in the 1946 agreement here, or to contain no expiration date at all. Section 8(d) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(d) (1), provides for such agreements, and their validity has been repeatedly recognized by the Board and the federal courts. See N. L. R. B. v. Clara-Val Packing Co., 9 Cir., 1951, 191 F.2d 556; Boeing Airplane Co. v. Aeronautical Industrial Dist. Lodge No. 751 of International Ass'n of Machinists, D.C.W.D.Wash.1950, 91 F.Supp. 596, 602–603; Lion Oil Co., 109 N.L.R.B. 680 (1954). Therefore, the fact that this agreement was entered in 1946 did not prevent it from being in effect 12 years later if the requisite notice of cancellation had not been given by either party.

The Trial Examiner apparently felt that the closed shop provision in the 1946 agreement (supra) was illegal, and that this was relevant to the decision of this case. The closed shop provision was inserted into this agreement at a time when such provisions were still legal and valid. It is separable from and not basic to the remaining provisions of the agreement, including the one which incorporates respondent's hiring hall. Whether the closed shop provision is now illegal because of the Labor Management Relations Act of 1947 depends upon whether it comes within the saving clause in Sec-

tion 102 of that Act. 61 Stat. 136, 152 (1947). However, should the provision be illegal, this would be a case of supervening illegality due to the statutory enactment, and the result would be that this provision became void and unenforceable as of the effective date of the statute. Dist. Lodge No. 94 of the Int'l Assoc. of Machinists v. Akmadzich, 15 Labor Cases Par. 64,564 (S.D.Cal.1948); cf. Charles E. Daboll, Jr., 105 N.L.R.B. 311, 312 (1953); Utah Construction Co., 95 N.L.R.B. 196, 209 (1951). The remainder of the agreement would remain valid and enforceable, including the hiring hall provision.

The Trial Examiner apparently felt that the hiring hall provision was illegal per se under the decision of the Board in Mountain Pacific Chapter of the AGC, Inc., 119 N.L.R.B. 883 (1957). However, the Board's decision in that case has since been overruled by this court. N. L. R. B. v. Mountain Pacific Chapter of Associated General Contractors, 9 Cir., 1959, 270 F.2d 425. In so doing this court stated: "An agreement that the hiring of employees be done through particular union offices does not violate the Act 'absent evidence that the union unlawfully discriminated in supplying the company with personnel.'" 270 F.2d at page 430. The actual operation of the hiring hall provision involved here is not before us.

The final consideration mentioned in the Trial Examiner's opinion, and the one which presents the most difficult question, is that W. L. Martin apparently signed the 1946 agreement at a time when he was still doing business as "W. L. Martin, Contractor", and prior to the formation of "Martin Bros.", which the Trial Examiner found occurred in 1948. It appears that Martin Bros. was a continuation of the same business and that the sole change was the addition of W. L. Martin's brother as a partner. The common law and California rule in such a situation is that the partnership does not become liable for the one partner's existing obligations unless it assumes such liability. See 37 Cal.Jur.2d

Partnership § 56 (1957). However, regardless of its subjective intent the partnership will become bound by such an obligation if it leads the other party to reasonably believe that it has adopted the obligation and to act in reliance thereon. Burritt v. Dickson, 1857, 8 Cal. 113.[3] The admitted facts and uncontradicted testimony establish that Martin Bros. has acted in such a way as to indicate its adoption of the 1946 agreement, and show that the Union has believed Martin Bros. adopted the agreement and has relied thereon. Martin Bros. has at all times paid the wages and other benefits called for by the 1946 agreement. More important yet, it appears that each time the Union has complained about Martin Bros.' hiring laborers without clearance from the hiring hall, Martin Bros. has discharged the laborers so hired unless and until they could obtain such clearance. From the testimony of Mr. D'Amico as to the earlier incidents, and from the testimony of the Board's witnesses as to the present incident, it appears that no threats or coercion were at any time applied to Martin Bros., but that the mere complaint that a laborer had been hired without clearance was sufficient to cause Martin Bros. and their foreman to dismiss the laborer involved or require that he get clearance before continuing. These factors require a conclusion that Martin Bros. by its actions held out that it had adopted the 1946 agreement and was therefore contractually bound to utilize respondent's hiring hall. We find no substantial evidence to the contrary in the record as a whole. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Contrary to the finding of the Board we conclude that the hiring hall provision of the 1946 agreement was in effect and binding as between Martin Bros. and the Union at the time Mr. Garcia and Mr. Gallego were laid off.

At the end of the hearing before the Trial Examiner, counsel for the Labor Board sought to amend the complaint so as to allege that the hiring hall provision in the master AGC contract, which provision is adopted by the 1946 agreement binding Martin Bros., is illegal because of the way it is worded and the manner in which it has been applied by the Union and the other parties to the agreement. Section 10(b) of the National Labor Relations Act authorizes the hearing officer and the Board itself, in its discretion, to amend the complaint at any time prior to the issuance of an order based thereon.[4] In this particular case the Trial Examiner and the respective counsel agreed that if the amendment were allowed it would be necessary to give notice to everyone who is a signatory of the AGC agreement and allow them to appear and present evidence in a prolonged future hearing. Pointing out that this would greatly expand the issues of the instant case, which had been completely tried on the theory that there was no contract between respondent and Martin Bros., the Trial Examiner denied the motion to amend. There was no abuse of discretion in denying such a motion, coming when it did at the end of the entire hearing and in view of the fact that the existence of the contract had been alleged in respondent's answer to the original complaint.

The petition to enforce the order of the Board is denied.

3. It is possible, in the light of Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, that California law does not control this issue and that this court should instead fashion a federal rule which would best effectuate federal policy as established by the national labor laws. Should that be the case, it is our opinion that federal policy is as interested in protecting the right to rely on labor agreements as the states are in protecting other contracts, and that this same rule should thus apply here.

4. Section 10(b) of the National Labor Relations Act, 29 U.S.C.A. § 160(b), reads, in relevant part:
"Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon."