NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

David F. IRVIN and James B. McKelvy,
Partners, d/b/a The Irvin-McKelvy
Company, Respondents.

No. 72-1168.

United States Court of Appeals,
Third Circuit.

Argued Feb. 5, 1973.

Decided March 22, 1973.

Peter G. Nash, Patrick Hardin, Marcel Mallet-Prevost, Abigail Cooley Baskir, Michael S. Winer, Washington, D. C., for Petitioner, National Labor Relations Board.

Francis T. Coleman, William H. Howe, Counihan, Casey & Loomis, Washington, D. C., for Respondents.

Edward L. Carey, Bernard Dunau, Washington, D. C., for United Mine Workers of America as amicus curiae.

Before BIGGS and GIBBONS, Circuit Judges, and HUYETT, District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This case is before us on the application of the National Labor Relations Board (the Board) filed pursuant to Section 10(e) of the National Labor Retions Act, 29 U.S.C. § 160(e), for enforcement of the November 8, 1971 order against the respondents David F. Irvin and James B. McKelvy, partners doing business as The Irvin-McKelvy Company ‚(the Employer).[1] The Employer is engaged in construction work for coal mine operators in the bituminous coal fields. The charging party in the proceedings before the Board was International Union of District 50, Allied and Technical Workers of the United States (District 50). United Mine Workers of America (UMW), though not a respondent here, participated in the proceedings before the Board as a party to a contract with the Employer, and has filed an amicus curiae brief with this court. The case involves the application of Section 8(f)[2] of the National Labor

---

1. The Board's order is reported at 194 NLRB No. 8, 78 LRRM 1516 (1971).

2. Section 8(f) provides:
   "It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor or- ganization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title."

Relations Act, 29 U.S.C. § 158(f), to prehire collective bargaining agreements in the construction industry made successively with rival labor organizations.

Section 8(f) was enacted as Section 705 of the Labor-Management Reporting and Disclosure Act of 1959, Pub.L. No. 86–257, 73 Stat. 519. It amended Section 8 of the National Labor Relations Act by adding a new subsection, applicable to the construction industry, providing among other things that it would not be, as it would otherwise have been, an unfair labor practice for an employer engaged primarily in that industry, to make a collective bargaining agreement with a labor organization covering its employees prior to the time the majority status of that labor organization had been established in a manner authorized by Section 9 of the Act, 29 U.S.C. § 159. The amendment was adopted to meet specific problems which had arisen in the construction industry under the prior law because of the transitory nature of the employer-employee relationship in that industry. During the Wagner Act period the Board had declined to exercise jurisdiction over the industry. In 1947, after passage of the Taft-Hartley amendments, the Board applied the provisions of the Act to the industry with consequent difficulties. These difficulties are discussed in Senate Report No. 187, House Report No. 741, and Conference Report No. 1147, 86th Cong., 1st Sess. (1959). 1959 U.S.Code Cong. & Ad.News, 86th Cong., 1st Sess. 2318, 2344, 2441, 2513. In summary, prehire agreements which would otherwise be invalid were authorized in the construction industry because of the dual necessities (1) that construction bidders know in advance of bid what their labor costs would be, and (2) that construction employers have access to an available pool of skilled craftsmen for quick reference.

The Employer here falls within § 8(f). It employs a more or less stable work force of approximately eighteen employees. Prior to June, 1964, the employees were not represented for collec-

tive bargaining. At that time, in order to obtain work from bituminous coal operators needing construction, the Employer signed a collective bargaining agreement with District 50. This agreement was supplanted, on June 27, 1967, by an industrywide contract between the Coal Mine Construction Contractors Association, Inc. (CMCCA) and District 50, by its terms effective from June 1, 1967 to May 31, 1970.

Both the original June, 1964 contract and the June, 1967 contract contained a union security clause and a dues check-off clause. The June, 1967 contract contained a "most favored nations" clause to the effect that if District 50 executed any contract with a construction contractor in the coal fields and that contract contained more favorable provisions than the CMCCA–District 50 contract, any employer signatory to the latter could immediately have the benefit of identical provisions. On October 29, 1968, District 50 entered into a contract with Zeni-McKinney-Williams Corporation identical with the CMCCA agreement, except that it was a "project only" agreement rather than one for the term June 1, 1967 to May 31, 1970. Shortly thereafter the general counsel of CMCCA advised District 50 that CMCCA considered the Zeni-McKinney-Williams contract to be more favorable than the fixed-term agreement, and that all members of CMCCA were thereafter bound to District 50 only for the period of time required for the completion of those construction projects then being worked on. District 50 has always disputed this construction of the "most favored nations" clause, but the Board found that after it entered into a "project only" agreement with a competitor, District 50's contract with the Employer was converted to a project agreement. That finding is not in dispute in this enforcement proceeding.

In late 1968 the Employer joined the Association of Bituminous Contractors (ABC) in order to avail itself of an agreement which on December 10, 1968, ABC had signed with UMW. By this

time the Employer's customers were advising that to get their construction business the work would have to be done by UMW labor. The Employer continued to recognize the District 50 contract on three or four existing projects. It concluded that as of April 1, 1969, all projects to which the District 50 contract applied were substantially complete. Beginning on April 1, 1969, therefore, it applied to all its employees the provisions of the ABC–UMW contract.[3] The employees joined the UMW. District 50 filed with the Board a charge that the Employer violated Sections 8(a)(1), (2), (3) and (5) of the Act by withdrawing recognition from it and recognizing the UMW.

The Board concluded that as of April 1, 1969, all of the Employer's employees working on projects still not completed on March 31 were members of District 50, and that on those projects District 50 had majority status. It ruled, therefore, that in ceasing to recognize District 50 as of April 1, 1969, the Employer violated Sections 8(a)(5) and (2) of the Act, and that in requiring employees on projects still in progress on March 31, 1969, to join the UMW the Employer violated Sections 8(a)(3) and (1) of the Act. The Board recognized that the conversion of the District 50 contract from a term to a project agreement left the Employer free to make a § 8(f) pre-hire agreement with the UMW covering subsequent projects, but it qualified that recognition by the language "so long as it did not employ at such projects a work force of which a majority were District 50 members." Irvin-McKelvy Co., 194 NLRB No. 8, 78 LRRM 1516, 1518. As shall be developed hereafter, the qualifying language introduced a serious ambiguity, which was not clarified

by those parts of the Board's cease and desist order dealing with the status of the UMW. The Board ordered the Employer to cease and desist from:

"(d) Requiring membership in the Mine Workers as a condition of employment on any projects covered by Respondent's contract with District 50. . . ."

In its brief in support of the application for enforcement, the General Counsel takes the position that the Board intended the quoted cease and desist provision to apply not only to pre-March 31, 1969 projects, but also to post-March, 1969 projects on which the Employer's regular work force, members of District 50 by virtue of the union security clause in the § 8(f) contract with that union, may be employed. That position, the General Counsel urges, is consistent with the further provision in the Board order that the Employer:

"2. (a) Withdraw and withhold recognition from the Mine Workers as the collective-bargaining representative of Respondent's employees who are working on projects covered by the District 50 contract *unless and until such labor organization shall have been certified by the National Labor Relations Board.*" (emphasis supplied)

The Employer moved before the Board for a clarification of this order. On June 1, 1972, the Board ruled:

"By its Decision and Order, the Board intended that when the Respondent, on any project, new or old, continues to use a work complement constituting an appropriate unit of which a majority continues to consist of members of District 50, the Respondent is not free to sign a contract with the United

---

3. The employees did not complain since the hourly wage rates in the ABC–UMW contract were significantly higher. The record discloses these examples:

| Job Classification | District 50 Hourly Rate For 1969 | UMW Hourly Rate | Increase |
|---|---|---|---|
| Welder | $3.89 | $4.125 | 23.5¢ |
| Truck Driver | 3.25 | 3.745 | 49.5 |
| Laborer | 3.14 | 3.745 | 60.5 |

Mine Workers of America or any other labor organization covering the said unit."

The clarifying order and the italicized language in the original Board order, according to the General Counsel, indicates that the Board has applied to the CMCCA–District 50 contract the presumption of Machinists Local 1424 v. NLRB, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960); that is, that the six-month limitation in Section 10(b) of the Act, 29 U.S.C. § 160(b), prohibited an inquiry into the majority status of District 50 and the contract carried with it a presumption of majority status.

An appreciation of the General Counsel's position requires familiarity with the Board's decision in R. J. Smith Construction Co., 191 NLRB No. 135, 77 LRRM 1493 (1971), enforcem't pending sub nom. Local 150, International Union of Operating Engineers v. NLRB, No. 71–1689 (D.C.Cir.) In that case the Board had before it successive § 8(f) contracts with rival unions. The employer repudiated the first contract, and the first union as charging party urged a § 8(a)(5) violation. The charging party contended that Machinists Local 1424 v. NLRB, *supra*, gave it, by virtue of its contract, the benefit of an irrebuttable presumption of continued majority status. The Board held:

"Such is not the case with an 8(f) agreement. As previously described, an 8(f) agreement, because of its pre-hire nature, need not be made with a majority union to be legal. For this reason, there is no basis, either in logic or in policy, to extend to the union which is party to such a contract, an irrebuttable presumption of majority status. Indeed, we conclude that-any such presumption would be irreconcilable with the final proviso to Section 8(f). It is, of course, necessary sometimes to go behind the 10(b) period to see what kind of contract is involved in a particular case— . . . . However, once that is accomplished and it is determined that the particular contract is validated by Section 8(f)

rather than by Section 9(c)(3)—one to which no irrebuttable presumption of majority status can be attached [5]—

5. It is possible that, in some situations, at least a rebuttable presumption of majority will arise from an 8(f) contract. This might occur, for example, when a union-security agreement is present in the 8(f) contract and has been enforced. That is not the case here."

that is the end of the pre-10(b) inquiry.

R. J. Smith Construction Co., *supra*, 77 LRRM at 1495–96.

The instant case presents the fact situation hypothesized in footnote 5 of the Board's *R. J. Smith Construction Co.* decision. District 50 is party to a § 8(f) contract with a union security agreement which was enforced. The effect of the General Counsel's interpretation of the Board's decision is that the Employer may not change the collective bargaining representative of those employees who became members of District 50 under the compulsion of that § 8(f) agreement except by virtue of a § 9(c) or § 9(e) representation petition. The Employer has, in other words, lost the § 8(f) option with respect to such employees.

The Employer, responding to the application for enforcement, urges as a first position that the Board erred in finding that the District 50 contract had not terminated on April 1, 1969. With respect to those projects which were underway prior to March 31, 1969, however, substantial evidence in the record as a whole supports the Board's finding that in three or four instances the projects were not complete on that date. Since the District 50 contract was by this time a project agreement, it still applied to these projects. Accepting the Board's findings in this respect, two questions are presented. First, where an employer's business has more than one bargaining unit (in this case the unfinished projects and subsequent projects to which the first contract by its terms did not apply) may a § 8(f) employer, without a representation proceed-

ing, make a § 8(f) agreement with a new union, although he employs at the new bargaining unit persons who by operation of the union security clause in the first contract became members of the first union? Second, may a § 8(f) employer, without a representation proceeding, repudiate a § 8(f) contract containing a union security clause which has been enforced, and enter into a new § 8(f) contract covering the bargaining unit and employees to which the first contract applied? The first question arises from the Board's prohibition against recognizing the UMW on new projects where District 50 members are employed. The second question is applicable only to those portions of the Board's decision finding a violation and its order granting relief with respect to the three or four projects uncompleted on April 1, 1969.

■ The General Counsel contends that both questions must, by virtue of the so-called *Midwest Piping* rule, be answered in the negative. In Midwest Piping & Supply Co., 63 NLRB 1060, 17 LRRM 40 (1945), the Board held that an employer violated the Act by executing an agreement with one of two rival unions while a representation dispute was pending. The employer, the Board held, must resort to the representation proceedings specified in the Act. But we think that the General Counsel's position gives too little heed to the changes wrought, in the construction industry, by the enactment of § 8(f). By that section construction industry employers were excused from the duty of neutrality mandated by the prohibition against unlawful assistance in §§ 8(a)(1), (2) and (3). At the same time the final proviso of § 8(f) establishes that recognition via the § 8(f) route shall not be a bar to a § 9(c) petition by employees or by a rival labor organization for a representation election. In the construction industry the employer need not remain neutral in representation matters, but both the employees and rival labor organizations are free to resort to the Board for a representation election at any time.

■ The foregoing discussion suggests, we think, the correct answer to the first question, at least in a context where the first § 8(f) contract is, as here, a project rather than a term agreement. Since there is no duty of neutrality in representation matters, on new projects the Employer was free to assist the UMW by entering into a prehire contract. The union membership of the prospective employees on new projects was irrelevant, at least until such time as they or District 50 petitioned the Board for a representation election pursuant to Section 9(c) of the Act.

■ The second question, however, is somewhat more complex. While it is clear that a construction industry employer is free to assist a selected union by a prehire agreement that would, except for § 8(f), be unlawful, it does not appear that such an employer has been excused from the duty of bargaining collectively. A refusal to bargain collectively with a designated representative of employees is an unfair labor practice under § 8(a)(5), subject to the provisions of § 9(a). The latter section provides:

> "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representative of all the employees in such unit for the purposes of collective bargaining. . . ." 29 U.S.C. § 159(a).

The Employer suggests that District 50 was never "designated or selected . . . by the majority of the employees in a unit" because the designation was made by it pursuant to § 8(f). It contends that the Board has recognized that this is the reality of the situation in *R. J. Smith Construction Co., supra,* which, properly interpreted, leaves a construction industry employer free at all times to repudiate a collective bargaining contract with one union and enter a new one with another. While the contract in *R. J. Smith Construction Co., supra,* did not contain a union security clause, this, the Employer urges,

should make no difference, since that clause is no more free of the taint of employer assistance than the balance of the contract.

■■■■ Without suggesting how we would rule if presented with the repudiation during its term by a § 8(f) employer of a collective bargaining agreement containing no union security provisions,[4] we reject the interpretation of § 8(f) advanced by the Employer here, where there was a union security clause and a dues checkoff provision, both of which were complied with until April 1, 1969. Nothing in either the text or the legislative history of § 8(f) suggests that it was intended to leave construction industry employers free to repudiate contracts at will. It is significant, we think, that despite the instant contract provisions and their enforcement, the employees did not, from June, 1964 to April, 1969, petition for a representation election. There was at least tacit acquiescence in the designation of District 50 as collective bargaining representative. Whatever may be the correct rule in the absence of union security and dues checkoff clauses, at least where the union's role has by the operation of such clauses been brought home to the employees quite directly, and they have refrained from seeking a representation election, an employer is not free to repudiate his § 8(f) contract during its term. That being so, the Employer violated § 8(a)(5) when it unilaterally substituted the terms of the ABC–UMW contract as of April, 1969, on the three or four projects then unfinished.

■■■■ Because of the passage of time since the last action by the Board (June 1, 1972) it seems highly likely that all projects which were unfinished on March 31, 1969, have now been completed. If this is the case, the CMCCA–District 50 contract has expired by its terms. Since we have concluded that the Board decision was correct only insofar as it found unfair labor practices in connection with the projects existing but uncompleted on March 31, 1969, the need for injunctive enforcement of the Board's order may no longer exist. The application for enforcement will be denied insofar as it applies to construction projects commenced by the Employer after April 1, 1969. The application for enforcement will be denied insofar as it applies to construction projects commenced by the Employer prior to, but uncompleted on April 1, 1969, without prejudice to an application by the General Counsel, within thirty days from the filing of our judgment, on notice to the attorney for the Employer, to which a response may be filed within ten days of such notice, setting forth reasons, if any, which may still exist for enforcement of the Board's order with respect to such projects. If such an application is filed it will be referred by the Clerk to the same panel of this court which heard this application.

■■■■

4. Members Fanning and Brown dissented from the holding in R. J. Smith Construction Co., 191 NLRB No. 135, 77 LRRM at 1496. They would hold that even in the absence of a union security clause a § 8(f) employer must bargain collectively with a union with which it has made a § 8(f) contract until its expiration or until a representation election changes the collective bargaining representative. *Cf.* NLRB v. AAA Electric, Inc., 472 F.2d 444 (6th Cir. 1973).