EASTERN DISTRICT COUNCIL OF the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA and Guy Anderson, et al., Plaintiffs,

v.

BLAKE CONSTRUCTION CO., INC., Defendant.

James C. HOVIS et al., Trustees of the Eastern District Council of Carpenters Pension Fund and Health and Welfare Funds, Plaintiffs,

v.

BLAKE CONSTRUCTION CO., INC., Defendant.

Civ. Nos. 77–291–N, 77–534–N.

United States District Court, E. D. Virginia, Norfolk Division.

Sept. 21, 1978.

Louis B. Fine and Howard James Marx, Norfolk, Va. (Fine, Fine, Legum & Fine, Norfolk, Va., on briefs), for plaintiffs in Civ. No. 77–291–N.

Collister Johnson, Jr., Washington, D. C. (Peabody, Rivlin, Lambert & Meyers, Washington, D. C., on briefs), for defendant in both cases.

Monroe Kelly, III, Norfolk, Va. (Wolcott, Spencer & Rivers, Norfolk, Va., on briefs), for plaintiffs in Civ. No. 77–534–N.

## OPINION

WALTER E. HOFFMAN, District Judge.

These are consolidated actions filed by the Eastern District Council of the United Brotherhood of Carpenters and Joiners of America on behalf of its members and representatives, and Hovis, et al, Trustees of the Eastern District Council of Carpenters Pension and Health and Welfare Funds, against the Blake Construction Company for damages resulting from the breach of an international agreement, sometimes referred to as a national agreement. Civil Action No. 77–291–N was filed in this court by plaintiff labor union on the basis of diversity jurisdiction. Civil Action No. 77–534–N is before the court on removal from the Circuit Court of the City of Norfolk, pursuant to Title 28, U.S.C. § 1441. Additional grounds for jurisdiction are authorized by 29 U.S.C. § 185, as this suit involves a contract between an employer and a labor organization.[1] The actions were consolidated by order of this court.

---

1. No. 77–291–N was, as noted, originally filed as a class action but the Court was never requested to certify same under Rule 23, F.R. C.P., in any pretrial proceedings. During the course of trial the Court noted, *sua sponte* the absence of any certification. At that time the Court deferred ruling and indicated its willingness to consider post-trial certification or possibly permit the filing of an amended complaint. At a post-trial hearing the Court denied the request for certification as being untimely, but granted leave to file an amended complaint. Plaintiffs in No. 77–291–N thereafter filed an amended complaint naming 125 individual plaintiffs as parties plaintiff alleging additional jurisdiction under 29 U.S.C. § 185 in behalf of the union and non-union members as the statute of limitations had not run as to these plaintiffs. Ample opportunity was afforded the parties to present additional evidence, take dis-

On November 29, 1968, Morton Bender, President of Blake Construction Company, signed a contract which is commonly known in the construction industry as an international agreement. Such an agreement is for the benefit of construction companies who do work outside of the geographic location in which they are located and in which they may have collective bargaining agreements covering wages, fringe benefits and working conditions. By signing an international agreement with the United Brotherhood of Carpenters and Joiners, a contractor obtains the benefits of local agreements negotiated between contractors' associations and district councils. In this particular agreement Blake agreed to recognize the jurisdictional claims of the United Brotherhood, and

> [T]o work the hours, pay the wages and fringe benefits and observe the lawful working conditions . . . established or agreed upon by the United Brotherhood of Carpenters and Joiners of America and the recognized agency of the locality in which any work of the Company is being done, with respect to journeymen carpenters employed by the Company. . . . No change is to be made in the hours, wages and other conditions established or agreed upon in any locality.

In return the United Brotherhood agreed to furnish competent journeymen for reference to jobs upon a non-discriminatory basis by means of district council or local union hiring halls. The United Brotherhood also agreed that there would be no strike pending any dispute being investigated. The agreement contained no provision as to duration or termination of the contract and it clearly appears that it was a contract terminable at will.

Previously, in 1957 and 1958, Blake had executed similar agreements with the United Brotherhood, and had completed at least two construction projects in Norfolk in the early 1960's, presumably operating under the 1958 agreement. In 1968 two signed copies of the new agreement were sent to Blake, informing the company that the 1958 agreement was being terminated and that, if it wished, it could sign the new agreement. Differences between the two documents were slight. Bender executed the new agreement and returned it to national headquarters, but had apparently forgotten the 1968 agreement by the time of the events referred to herein.

Blake was the successful bidder on the Leigh Memorial Hospital and Eastern Virginia Medical Building projects which were begun in Norfolk during 1975. Early that year (in April) a Blake representative visited Local No. 331 of the United Brotherhood and requested that Edwin Gentry, the union business representative, send two carpenters to the site of the Leigh Memorial Project.[2] Gentry testified that the Blake person said Blake had an international agreement. He checked his files and verified that Blake was listed as a signator to the international agreement. The carpenters reported to the jobsite and helped construct the necessary temporary office and sheds for a job of that nature.

Sometime in May the two carpenters were laid off temporarily because of lack of materials. Later in May, Gentry visited the jobsite and discovered that work had resumed, but was informed that the job would be worked "open shop." Gentry reported his findings to James C. Hovis, financial secretary of Local No. 331 and secretary-treasurer of the Eastern District Council, a plaintiff in this action, who then reported the situation to officials of the United Brotherhood at its headquarters in Washington. Following further investiga-

---

covery in advance thereof, etc., but the parties declined and entered into a stipulation that the individual plaintiffs could proceed under the authority granted to James Hovis to act in their behalf.

Contemporaneous with the filing of the amended complaint the individual plaintiffs filed a separate action, Civil Action No. 78–202–N, for reasons not disclosed of record. It is assumed that the disposition of No. 77–291–N will also dispose of No. 78–202–N as the issues are the same. No. 78–202–N has not been consolidated of record with No. 77–291–N.

2. The Eastern Virginia Medical Building had not started at this time.

tion Patrick J. Campbell, second general vice president of the United Brotherhood, met with Bender in July. Bender stated that he did not remember having an international agreement and that he had bid the two projects "open shop" and did not intend to pay union scale. Campbell mailed to Bender a copy of the agreement with his signature on it and arranged for a second meeting in August. At that meeting Bender positively again stated that he was not going to pay union scale and that the job was going to be worked "open shop." Apparently the meeting adjourned with the two men agreeing that they had a problem and that they would try to work something out.

A third and final meeting occurred in November, 1975. William Sidell, general president of the United Brotherhood, and Leo Nazdin, an official of the International Laborer's Union, were present in addition to Bender and Campbell. Bender again stated that he could not pay union scale on the jobs. He did make several offers, including an offer to work one job open shop and the other job union,[3] or to negotiate a rate for both jobs but below union scale. Bender stated in a pretrial deposition that at that time he did not know whether his company and the union had a valid agreement, but that he was willing to compromise in order to work out a solution. There were no further negotiations between the parties.

There is in evidence a letter purportedly sent by Bender to Campbell, dated December 15, 1975, whereby Bender stated that he had found it necessary to void the international agreement. Campbell and Sidell deny ever having received such a letter. The letter was not discovered until after responsive pleadings and answers to interrogatories had been filed. There are many differences in the style of the letter as compared to other letters typed by Bender's

secretary at that time, whose initials appear on the copy. Despite this fact, no attempt was made to produce this secretary at trial.[4] This Court has serious doubts that this letter was ever mailed; however, the determination reached in this case renders moot any effect the letter might have had on the outcome.

Civil Action No. 77–534–N is an action brought by the Trustees of the Eastern District Council of Carpenters Pension Fund and Health and Welfare Funds for certain fringe benefits which accrued after 1968 but prior to the legal termination of the 1968 agreement. To the extent ascertained by this opinion, the Court is of the opinion that the defendant is liable to the plaintiffs under a third-party beneficiary theory.

I

Plaintiffs allege that the 1968 international agreement obligates the defendant to pay the wage scale and abide by the terms negotiated between the Virginia Association of Contractors and the Eastern District Council of Carpenters. These terms are contained in a 1972 trust agreement and a 1974 memorandum of understanding. It is argued that they are incorporated by reference into the international agreement. Blake was not a signator to the Eastern District Council agreements, nor is the company a member of the Virginia Association of Carpenters. Defendant argues that these agreements were not in existence in 1968, and therefore could not be incorporated by reference into an earlier agreement. Defendant further argues that the 1968 agreement purportedly binds Blake to conditions established or agreed upon by the United Brotherhood of Carpenters and Joiners, and does not obligate Blake to observe those negotiated by local or regional unions affiliated with the International. The International did not participate in or

---

**3.** In the interim Blake had contracted to build the Eastern Virginia Medical Building.

**4.** While the Court was advised that the secretary had no recollection of writing the particular letter, all of which is understandable, the

testimony of the secretary may have furnished some explanation as to the style of this letter which differed materially with approximately 17 letters written by the same secretary in January 1976.

ratify the local agreements. Finally, defendant contends that any ambiguity in the 1968 agreement must be construed against the plaintiffs, as their national union drafted the agreement.

A discussion of the nature and purpose of the international agreement may be helpful. As noted above, the purpose of such an agreement is to make it unnecessary for a contractor who works on an international, national or regional level to negotiate with the local union or district council of the United Brotherhood each time that a contractor enters a geographical area in which he is not a party to the local collective bargaining agreements. The agreement is in the nature of a prehire agreement, a special kind of labor contract peculiar to the construction industry, in that it would represent an unfair labor practice in other industries. Congress specifically recognized the need for such agreements by enacting § 8(f) of the National Labor Relations Act, the purpose of which was discussed thoroughly in *N. L. R. B. v. Irvin*, 475 F.2d 1265, 1267 (3rd Cir. 1973):

> Section 8(f) was enacted as Section 705 of the Labor-Management Reporting and Disclosure Act of 1959, Pub.L. No. 86–257, 73 Stat. 519. It amended Section 8 of the National Labor Relations Act by adding a new subsection, applicable to the construction industry, providing among other things that it would not be, as it would otherwise have been, an unfair labor practice for an employer engaged primarily in that industry, to make a collective bargaining agreement with a labor organization covering its employees prior to the time the majority status of that labor organization had been established in a manner authorized by Section 9 of the Act, 29 U.S.C. § 159. The amendment was adopted to meet specific problems which had arisen in the construction industry under the prior law because of the transitory nature of the employer-employee relationship in that industry. During the Wagner Act period the Board had declined to exercise jurisdiction over the industry. In 1947, after passage of the Taft-Hartley amendments, the Board

applied the provisions of the Act to the industry with consequent difficulties. These difficulties are discussed in Senate Report No. 187, House Report No. 741, and Conference Report No. 1147, 86th Cong., 1st Sess. (1959). 1959 U.S.Code Cong. & Admin.News, 86th Cong., 1st Sess. 2318, 2344, 2441, 2513. In summary, prehire agreements which would otherwise be invalid were authorized in the construction industry because of the dual necessities (1) that construction bidders know in advance of bid what their labor costs would be, and (2) that construction employers have access to an available pool of skilled craftsmen for quick reference.

Federal courts have upheld the validity and enforceability of prehire agreements. *N. L. R. B. v. Irvin, supra; International Brotherhood of Electrical Workers, Local No. 12 v. A–1 Electric Service, Inc.*, 535 F.2d 1 (10th Cir. 1976); *N. L. R. B. v. International Hod Carriers, Building and Common Laborers Union of America, Local 300*, 287 F.2d 605 (9th Cir. 1961); *Local No. 150, International Union of Operating Engineers v. N. L. R. B.*, 156 U.S.App.D.C. 294, 480 F.2d 1186 (1973). In a recent case the Supreme Court created some doubt as to the enforceability of prehire agreements. *N. L. R. B. v. Local Union No. 103, International Association of Bridge, Structural and Ornamental Iron Workers*, 434 U.S. 335, 98 S.Ct. 651, 661, 54 L.Ed.2d 586 (1978). However, that case dealt with the question of whether certain picketing was an unlawful labor practice and is not determinative on the facts of this case.

■ The international agreement in the case at bar is not so ambiguous as to be unenforceable. From a plain reading of the language of the agreement and from the custom and practice of the industry, it is obvious that the contractor obligated itself to pay the union rate prevailing in any jurisdiction in which it undertakes a project outside its own geographic area. As the Supreme Court noted in *Transportation-Communication Employees Union v. Union*

*Pacific R. R.*, 385 U.S. 157, 160–161, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966):

A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. . . . In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.

To agree to pay the prevailing rate for labor and services is really no different from agreeing to pay the market rate for goods to be purchased at a future date.

Finally, it is not uncommon for a local affiliate to be bound by provisions of a collective bargaining agreement negotiated by an international union. In *Blake Construction Co., Inc. v. Laborers' International Union of North America*, 167 U.S.App.D.C. 86, 511 F.2d 324 (1975), the court held that local affiliates were bound by a no-strike provision contained in an international agreement executed by an employer and an international union:

Moreover, the contract is obviously intended to cover relationships other than those between its signers. And it is manifestly unreasonable to assume that Blake or any other employer contemplated a collective bargaining agreement that did not mutually obligate parties with whom Blake would be dealing directly to abide by its terms. 167 U.S.App.D.C. 92, 511 F.2d 330.

■ The international agreement executed by Blake Construction Company with the United Brotherhood of Carpenters and Joiners is a valid contract in the nature of a prehire agreement, and as such obligates Blake to pay the prevailing union scale and fringe benefits in any locality in which it undertakes construction projects.

## II

■ Defendant argues that the 1968 agreement was terminable at will, and that it was unilaterally terminated by Blake's refusal to pay union scale and fringe benefits, expressly informing the United Brotherhood and the District Council that it would not comply with the 1968 agreement, and refusing to change its position despite the repeated efforts of the union representatives. The agreement contains no provision regarding termination, or even the duration of the contract. Such a contract is presumed to be terminable at will according to principles of labor law, *Boeing Airplane Co. v. N. L. R. B.*, 85 U.S.App.D.C. 116, 119, 174 F.2d 988, 991 (1949), and traditional contract law, *Plaskitt v. Black Diamond Trailer Co.*, 209 Va. 460, 164 S.E.2d 645 (1968), upon reasonable notice to the other party of intent to terminate.

■ What constitutes reasonable notice may vary depending upon the facts of individual cases. Plaintiffs do not appear to contend that the contract is not terminable at will; rather they submit that the termination provision of § 8(d) of the National Labor Relations Act [29 U.S.C. § 158(d)] is applicable. This provision requires the service of written notice of termination on the other party at least sixty days prior to the proposed termination when a collective bargaining agreement contains no expiration date. However, not all contracts between labor unions and employers rise to the level of being collective bargaining agreements. *Retail Clerks International Association, Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 25–28, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962). As viewed by the National Labor Relations Board, a prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship. *Ruttman Construction Co.*, 191 N.L.R.B. 701, 702 (1971); *N. L. R. B. v. Local Union No. 103, supra*, 98 S.Ct. at 655. An international or prehire agreement is not the product of collective bargaining. It is merely an agreement to abide by the terms of collective bargaining agreements reached by other parties. The written notice provision of § 8(d) is therefore inapplicable.

■ Plaintiff cites five separate occasions between May and November, 1975 when Blake officials unequivocally told the International Union and the District Council that it would neither pay union scale nor conform with the International's interpretation of the 1968 agreement. Two of these statements were made by a Blake representative at the job site who had no actual or apparent authority to terminate an international agreement. The third occasion was a statement by Bender, president of Blake, at the July meeting with Campbell. Bender said that he did not recall having an international agreement, that he bid the job nonunion, and that Blake would not pay union scale. Denial of the existence of a contract is not necessarily the same as canceling an existing agreement. *Teamsters Local Unions 745, et al. v. Braswell Motor Freight Lines, Inc.*, 428 F.2d 1371, 1374 (5th Cir. 1970). Lastly, it is contended that Bender's continuing insistence at the August and November meetings, after being confronted with a copy of the agreement bearing his signature, constituted sufficient notice of intent to terminate the agreement.

■ The precise date of the August meeting date is difficult to pinpoint. Campbell, in his deposition, fixed the date as August 10 or 12, 1975. The Court fixes the date as August 12, 1975, as August 10, 1975 was a Sunday. As hereafter noted, the contract was completely terminated at the conclusion of the sixtieth day thereafter.

Defendant further argues that notice of intent to terminate a contract may be imparted by conduct, *Cronk v. Vogt's Ice Cream*, Sup., 15 N.Y.S.2d 649 (1939). *Cronk* dealt with a requirements contract, whereby defendant agreed to purchase all his raw milk and sweet cream from plaintiff at a given price. Performance under the contract continued for around nineteen

months, although the evidence indicated that defendant never dealt exclusively with plaintiff. The court cited the general rule that a contract calling for continuing performance and containing no provision for duration is terminable at will. Plaintiff sought damages after defendant stopped making purchases altogether. The court discussed whether notice of intent to terminate was necessary and, if so, whether notice was given. Notice was not required in New York to terminate employment contracts which were terminable at will. Notice might be required if substantial loss would otherwise result. Assuming *arguendo* that notice might be required, the court held that where the contract called for no formal notice of termination, open and notorious acts by one party, known to the other, which were inconsistent with the continuance of the contract would be sufficient notice of termination. 15 N.Y.S.2d at 655.

Similarly, Blake's acts in the case at bar were material breaches which went right to the heart of the contract. By not paying the union scale and fringe benefits, and by failing to make use of the union hiring hall, Blake repudiated virtually all of its obligations under the agreement. Bender's statements to the union representatives at a time when he was fully aware of the existence of the contract were sufficient notice to any reasonable man that Blake did not intend to be bound by the international agreement, and that if a contract had existed it was now at an end, subject to reasonable notice. To hold otherwise would be to exalt form over substance.

Notice of intent to terminate the international agreement was sufficiently manifest by the date of the August meeting. Borrowing from the notice provision of § 8(d) of the Labor Act, the contract was terminated at the conclusion of the sixtieth day following that date, through which time damages continued to accrue.[5]

5. The Court also borrows from the appendix in Nos. 77–1574 and 77–1575, *Miller, et al. v. Bechtel Corporation* (unpublished opinion decided by the Fourth Circuit on June 20, 1968). Referring to p. 96 of the appendix it is noted

that a national agreement with the same union provides for a written notice of termination or modification by giving sixty days' notice prior to any anniversary date. However, as previously observed, *the union did not elect to use*

 Defendant argues that to compel full payment to the trust funds of monies due as fringe benefits would constitute double payment, as fringe benefits have been paid to Blake employees on the projects in cash, pursuant to the Davis-Bacon Act. This argument is without merit, as the payments to the trust funds were vested contractual rights. The provisions of the Davis-Bacon Act are of no consequence. The Act was passed for the benefit of employees, not contractors, and serves only to establish a floor for the payment of wages and benefits. *Walsh v. Schlecht*, 429 U.S. 401, 411, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977). The Act does not enable contractors to freely ignore contractual obligations and escape liability. However, to the extent that cash payments were made directly to employees, these amounts should be included as part of the wages paid to them in figuring the differential between union scale and wages actually paid.

Plaintiffs request punitive damages and attorneys' fees. Punitive damages would be inappropriate in a case such as this where there are genuine issues of law as to the existence and enforceability of the contract. The awarding of attorneys' fees is within the sound discretion of the court, *Local Union No. 4, International Brotherhood of Electrical Workers v. Radio Thirteen-Eighty, Inc.*, 469 F.2d 610 (8th Cir. 1972), and is denied.

An appropriate judgment order will be prepared by counsel for plaintiffs and tendered to counsel for defendant prior to submission to the Court for entry. Interest shall run from the date of the judgment order. Further evidence may be taken, if necessary, in order to compute the amount of damages incurred prior to the date on which the contract terminated in accordance with this opinion, i. e., at the conclusion of the sixtieth day after August 12, 1975.

this form with Blake, although there is some evidence to the effect that both forms were used during 1968. The Court finds that a sixty-day oral termination notice, by conduct or otherwise, is reasonable under the facts of this case.