**TRUSTEES OF the ATLANTA IRON WORKERS LOCAL 387 PENSION FUND et al.**

v.

**SOUTHERN STRESS WIRE CORP.**

Civ. A. No. 77-1149A.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 13, 1981.

Joseph Jacobs, James T. Langford, Jacobs & Langford, Atlanta, Ga., for plaintiffs.

Floyd E. Siefferman, Jr., Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

In this labor relations action, the plaintiff Trustees seek to collect from the defendant

contributions allegedly owed the Fringe Benefits Funds. By order dated June 26, 1980, this court held that the "evidence has unmistakenly established as fact that defendant was committed to, and bound by, the collective bargaining agreement of August 29, 1968 between the union and the Association of Steel Erectors & Heavy Equipment Operators, Inc., which specifically bound it to the fringe benefits trust. . . ." Order of June 26, 1980 at 3.[1] We concluded, however, that the Supreme Court's decision in *NLRB v. Local 103, International Association of Bridge, Structural and Ornamental Iron Workers*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) (*Higdon*), required the plaintiffs to establish the union's majority status in order to convert the prehire agreement into an enforceable collective bargaining contract. The plaintiffs subsequently conceded, at an informal conference in chambers on November 11, 1980, that they would be unable to establish that the union achieved majority status on the terms set forth by the court.

Before final disposition of the case, however, the court directed the parties to brief two further issues that required consideration: (1) whether Congress, in enacting the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, (ERISA), intended to permit trustees of employee pension and welfare plans to recover delinquent contributions without regard to the technicalities of federal labor law, and (2) whether application of *Higdon* to cases such as the one before the court would require the court to make a determination as to the appropriate bargaining unit, a task entrust-

ed by Congress exclusively to the National Labor Relations Board (NLRB).[2] After a thorough reexamination of the legal authorities pertinent to this case, we conclude that we need not reach these issues for, in our view, *Higdon* does not bar a trustee collection suit brought pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a).

\* \* \* \* \* \*

This case presents an issue which has only recently been raised in the federal courts: whether the trustees of fringe benefit funds may enforce against an employer the provisions of a prehire agreement, authorized by section 8(f) of the National Labor Relations Act (Act), 29 U.S.C. § 158(f), even though the union with which the employer executed the agreement does not represent a majority of the workers in the employer's work force. Although this precise issue has been reached by only a few courts, the two areas of substantive labor law implicated by this question provide settled legal principles to guide the court's consideration of the issue.

■ The first of these is that body of caselaw construing the rights of non-party trustees to enforce the fringe benefit provisions of collective bargaining agreements. In doing so, the trustees stand, of course, as third-party beneficiaries of the collective bargaining agreement between the union and the employer. Under settled principles of contract law, the third party beneficiary may sue the promisor to enforce vested contractual rights. Although generally the promisor may assert against a third party beneficiary any defense good against the

---

1. Defendant does not now contest this finding. Indeed, given the course of conduct established by the evidence, it would be difficult to do so credibly. *Cf. Lewis v. Lowry*, 322 F.2d 453 (4th Cir. 1963).

 The complete text of the agreement between the union and the defendant may be found in our Order of June 26, 1980 at n.2.

2. By order dated August 19, 1980, this court, attempting to fashion guidelines governing the application of *Higdon* to this case, held that (1) foremen and other supervisory personnel were to be excluded from the employee unit, and (2) permit men were not to be counted as union

members in determining the union's majority status. Order of August 19, 1980 at 5. Plaintiffs contend that this court lacks jurisdiction to decide these questions, noting that the authority to designate appropriate bargaining units rests exclusively with the NLRB, *see* 29 U.S.C. § 159(b); *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); and that federal courts lack jurisdiction to review representation elections, *see Hendrix Manufacturing Co. v. NLRB*, 321 F.2d 100 (5th Cir. 1953). Given our disposition of this case, we need not reach this issue.

promisee, federal courts, following the lead of the Supreme Court in *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), have considerably limited the defenses which an employer may assert against trustees of fringe benefit funds in suits to recover delinquent contributions. Indeed, it may safely be said that the trustees enjoy a virtually unqualified right to enforce the employer's contractual obligations to these funds.

In *Benedict Coal*, the Supreme Court held that the employer could not assert the union's breach of the collective bargaining agreement as a defense in a suit by the trustees. The Court observed that it might be desirable in ordinary third-party beneficiary situations to hold that

> a promisor may "set off" the damages caused by the promisee's breach.... In other words, although the promisor's duty to perform has become fixed by the occurrence of applicable conditions precedent, the parties may be taken to have agreed that the extent of the promisor's duty to the third party will be affected by the promisee's breach of contract.

*Id.* at 467, 80 S.Ct. at 494. The Court noted, however, that a collective bargaining agreement is not a typical third-party beneficiary contract:

> The promisor's interest in the third party here goes far beyond the mere performance of its promise to that third party, i. e., beyond the payment of royalty. It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death. While employers in many other industries assume this burden directly, this welfare fund was jointly created by the coal industry and the union for that purpose....

Moreover, unlike the usual third-party beneficiary contract, this is an industry-wide agreement involving many promisors. If Benedict and other coal operators having damage claims against the union for its breaches may curtail royalty payments, the burden will fall in the first instance upon the employees and their families across the country. Ultimately this might result in pressures upon the other coal operators to increase their royalty payments to maintain the planned schedule of benefits.

*Id.* at 468–69, 80 S.Ct. at 494–95.

As one district court said in applying *Benedict Coal* a few years thereafter:

> Whatever one may think of the equities of the situation confronting a small coal company during hard times, if faced with a situation such as defendants allege was the case here, it seems clear that the law does not permit the written welfare agreement to be ignored by reason of any matters affecting the relationship of the coal company and the union *inter sese*. The Supreme Court has made it plain, in *Lewis v. Benedict Coal Co.*, that considerations of social welfare with regard to the benefits payable to miners from the fund make it inappropriate to admit defenses based upon the alleged misdeeds of the union.

*Lewis v. Harcliff Coal Co.*, 237 F.Supp. 6, 7 (W.D.Pa.1965) (citations omitted). This policy of disallowing employer defenses in trustee collection cases has continued unchanged to the present. As Judge Adams of the Third Circuit recently observed, concurring in that court's rejection of an employer's antitrust defense:

> Lower federal courts have recognized that the Supreme Court's discussion in *Benedict* evinces a considered judgment that the ramifications for national labor policies must be surveyed before labor agreements pertaining to employer contributions to union welfare and pension funds are subjected to contract principles governing third-party beneficiary situations.... Almost invariably, when faced with a suit to compel employer payments to union welfare or pension funds, the courts have disallowed defenses sought to be interposed by employers to enforcement of the contract based on such grounds as failure of consideration, existence of parol evidence to establish a

different agreement, fraud, misrepresentation, and duress on the part of the union.

*Huge v. Long's Hauling Co., Inc.*, 590 F.2d 457, 463–64 (3d Cir. 1978) (Adams, J., concurring) (footnotes omitted), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979). Thus, it is clear that if this case involved the usual collective bargaining agreement negotiated between a majority union and employer, the trustees would be entitled to recover.

Defendant contends, however, that because the benefit provisions sued on here had their genesis in a prehire agreement with a minority union, the agreement is unenforceable and the trustees may not recover. In order to evaluate this contention, the court must turn to the second area of substantive labor law pertinent here: that dealing with the enforceability of prehire agreements. It is a fundamental principle of our statutory labor law scheme that the labor organization which represents the employees in a unit must be "designated or selected for the purposes of collective bargaining by the majority of the employees. . . ." Section 9(a) of the Act, 29 U.S.C. § 159(a). To safeguard that selection process, it is an unfair labor practice for an employer under sections 8(a)(1) and (2), 29 U.S.C. §§ 158(a)(1) and (2),[3] and for a union under section 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A),[4] to interfere with, restrain, or coerce employees in the selection of their bargaining representative. Thus, it is unlawful for an employer to bargain or enter into a collective bargaining agreement with a minority union, even if the parties have a good faith belief that the union represents a majority of the workers in the unit. *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738–39, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961).

However, section 8(f) of the Act, 29 U.S.C. § 158(f),[5] provides an exception to the general prohibition and permits employers in the construction industry to negotiate a collective bargaining agreement with a labor organization prior to the establishment of its majority status pursuant to the provisions of section 9 of the Act, 29 U.S.C. § 159.[6] In enacting section 8(f), Congress acknowledged the unique nature of the industry: "[r]epresentation elections in a large segment of the industry are not feasible to demonstrate . . . majority status due to the short periods of actual employment by specific employers." S.Rep. No.187, 86th Cong., 1st Sess. 55 (1959), *reprinted in*

**3.** Those provisions read in full:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay. . . .

**4.** That section provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances. . . .

**5.** That section reads in part:

(f) It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement. . . .

**6.** Section 9 of the Act, 29 U.S.C. § 159, governs representation elections conducted by the NLRB.

[1959] U.S.Code Cong. & Ad.News 2318, 2373. The Congress noted that it was necessary (1) that construction bidders know in advance of bid what their labor costs would be, and (2) that construction employers have ready access to an available pool of skilled craftsmen. H.R.Rep. No.741, 86th Cong., 1st Sess. 19 (1959), *reprinted in* [1959] U.S.Code Cong. & Ad.News 2424, 2442.

 The exception is, however, a limited one. Unlike a regular collective bargaining agreement, a prehire agreement does not bar the employer or employees from requesting a representation election at any time [7] nor does the agreement confer on the signatory union a presumption of majority status.[8] *R. J. Smith Construction Co.*, 191 NLRB 693 (1971). As the NLRB has observed, a "prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." *Ruttmann Construction Co.*, 191 NLRB 701, 702 (1971). Despite these limitations, federal courts have routinely upheld the validity and enforceability of prehire agreements, *see, e. g., International Brotherhood of Electrical Workers, Local No. 12 v. A–1 Electric Service, Inc.*, 535 F.2d 1 (10th Cir.), *cert. denied*, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976); *NLRB v. Irvin*, 475 F.2d 1265 (3d Cir. 1973), and trustees of benefit funds have been permitted to recover delinquent contributions pursuant to the provisions thereof, *see, e. g., Eastern District Council of the United Brotherhood of Carpenters and Joiners of America v. Blake Construction Co., Inc.*, 457 F.Supp. 825 (E.D.Va.1978) (*Eastern District Council*).

The defendant contends, however, that the Supreme Court's decision in *Higdon* casts new light on the enforceability of prehire agreements and requires that judgment be entered in its favor in this action. In *Higdon*, as here, the company and the union had entered into a prehire agreement, providing that the company would abide by the terms of a contract between the union and a multiemployer association. When the union discovered that the sole stockholder in the company had formed another corporation for the express purpose of avoiding the agreement, its members picketed projects at which the union did not represent a majority of the workers. The Court upheld the NLRB's finding that it was an unfair labor practice, violative of section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C),[9]

7. Section 8(f) reads in pertinent part:

 *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

Generally, no election will be held in a bargaining unit in which in the preceding twelve-month period, a valid election has been held. *See* section 9(c)(3) of the Act, 29 U.S.C. § 159(c)(3). The NLRB has further held that it will not consider an election petition filed within twelve months of the certification of a union. This rule was subsequently approved by the Supreme Court. *See Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

8. With certain limited exceptions, a union enjoys a conclusive presumption of majority status for a period of twelve months following its certification after a representation election. *See Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125. A union which has been voluntarily recognized by an employer, after a demonstration of majority status, enjoys a similar presumption of continued majority support for a reasonable time. *See NLRB v. San Clemente Publishing Corp.*, 408 F.2d 367 (9th Cir. 1969).

9. The statute provides in pertinent part:

 (b) It shall be an unfair labor practice for a labor organization or its agents—

 . . . .

 (7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

 . . . .

 (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing

 . . . .

Stated briefly, the section bars recognitional picketing by an uncertified union which exceeds thirty days unless, during that period, the union files a petition for a representation elec-

for an uncertified minority union to engage in extended picketing to enforce a prehire agreement with an employer. At one point in its opinion, the Court noted that the "employer's duty to bargain and honor the contract is contingent on the union's attaining majority support...." 434 U.S. at 345, 98 S.Ct. at 657.

Some courts have construed this language broadly, concluding that it barred trustee collection actions such as that here. *See Washington Area Carpenters' Welfare Fund v. Overhead Door Co.*, 488 F.Supp. 816 (D.D.C.1980) (trust fund cannot sue employer pursuant to prehire agreement to recover delinquent contributions absent proof of the union's majority status); *Western Washington Laborers-Employers Health & Security Trust Fund v. McDowell*, 103 LRRM 2219 (W.D.Wash.1979) (same). Other post-*Higdon* decisions have permitted the trustees to recover, either without reaching the issue, *see, e. g., Bugher v. Southland Fabricators & Erectors, Inc.*, 452 F.Supp. 870 (W.D.La.1978), or by concluding that *Higdon* is inapplicable to trustee collection actions, *see Eastern District Council*, 457 F.Supp. 825.

The Eighth Circuit has recently addressed this precise issue. In *Health & Welfare Plan v. Associated Wrecking Co.*, 638 F.2d 1128 (8th Cir. 1981), that court reviewed the history of section 8(f) in light of *Higdon* and concluded that the absence of majority status does not preclude enforcement of the fringe benefit provisions of a prehire agreement. The court observed that the primary concern of the NLRB and Supreme Court in *Higdon* had been, in considering the relationship between sections 8(f) and 8(b)(7)(C), that unrestricted picketing by a minority union to enforce a prehire agreement would interfere with the employees' free choice of a bargaining agent, and permit the union "to accomplish through the back door by way of section 8(f) what it could not lawfully do at the front door under section 8(b)(7)(C)." *Id.* at 1133, *citing*

*Higdon*, 434 U.S. at 346, 98 S.Ct. at 658. The court characterized *Higdon* as holding that "a company does not commit an *unfair labor practice* for breach of its duty to bargain by unilaterally abrogating a prehire agreement with a labor union if that union never obtained majority support from the employees in the bargaining unit." *Id.* (emphasis in original). However, the court then noted, it

does not necessarily follow, however, that the absence of majority status leaves the union without a remedy for *breach of contract* on any provision of the section 8(f) agreement. To say that an employer may challenge the majority status of a union in an unfair labor practice proceeding is not to say that the employer may assert the union's lack of majority status as a defense in a breach of contract action on a type of contract specifically authorized by the Act.

*Id.* (emphasis in original). In concluding, the court said "we find no sanction in [*Higdon*] ... or the policies underlying section 8(f) for permitting an employer to unilaterally abrogate a validly executed prehire agreement on fringe benefits even though the union has not achieved majority status." *Id.* at 1134.

█ After a careful reexamination of this issue, we find that we are in agreement with the Eighth Circuit. We do not believe that *Higdon* is in conflict with the settled, long-standing legal principles which would permit the Trustees to recover the delinquent contributions sued on here. The language in *Higdon* must be read in light of the precise issue, and underlying factual situation, presented to the Court. The union's conduct, found in *Higdon* to be an unfair labor practice, threatened the employees' statutorily-mandated right to an uncoerced selection of a bargaining representative. There is not even the suggestion of an unfair labor practice in the present

tion with the NLRB. For a detailed consideration of the provision, see the NLRB's decision in *Hod Carriers Local 840 (Blinne Construction Co.)*, 135 NLRB 1153 (1962). *See generally* R. Gorman, *Labor Law* 220–39 (1976).

case.[10] Thus, the legal and public policy considerations found to be decisive in *Higdon* are utterly lacking in this trustee collection suit. The fact that an employer may abrogate a prehire agreement with a minority union does not suggest that the agreement is a nullity. "Nothing in either the text or legislative history of § 8(f) suggests that it was intended to leave construction industry employers free to repudiate contracts at will." *NLRB v. Irvin*, 475 F.2d at 1271.

Further, the equities in this case clearly favor the Trustees. We do not believe an employer should be permitted to avail himself of the advantages but avoid the obligations of a prehire agreement. The contributions sought to be collected here "are, in reality, indirect or deferred compensation, earned by the employee with each hour or each day worked." *Huge v. Long's Hauling Co., Inc.*, 590 F.2d at 464 (Adams, J., concurring). Our labor relations scheme imposes mutual obligations which must be observed. As the Fifth Circuit recently observed in a case involving a prehire agreement, the "employer here gained significant benefits from its relationship with the union. It was guaranteed a constant supply of skilled, diligent workers from the use of the union hiring hall. More significantly, the union guaranteed industrial peace at respondent's worksite." *NLRB v. Haberman Construction Co.*, 618 F.2d 288, 312 (5th Cir.), *rehearing en banc granted*, 618 F.2d 319 (1980).

■ Moreover, we are concerned with the inequity that would result if the employer is permitted to disavow its obligation to the trust funds while the trustees remain at least arguably obligated to the employee-·beneficiaries for the benefits represented by the delinquent contributions. An employee may of course sue to enforce his

rights to benefits due under trust fund agreements, *see* section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B); *Reiherzer v. Shannon*, 581 F.2d 1266 (7th Cir. 1978), and may, moreover, sue derivatively to enforce the employer's payment obligations when the trustees do not, *see Nedd v. United Mine Workers of America*, 556 F.2d 190 (3d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978).

Finally, we believe that the policy considerations which prompted enactment of ERISA and the recently-passed Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, 94 Stat. 1208 (1980), support the conclusion we reach here. Decisions applying *Higdon* so as to bar trustee collection suits were expressly disapproved during congressional consideration of the latter statute:

Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation involving claims and defenses unrelated to the employer's promise and the plan's entitlement to the contribution. This should not be the case. Federal Pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law—other than 29 U.S.C. 186. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

In this regard we endorse judicial decisions such as *Lewis v. Benedict Coal*

---

10. Furthermore, an employer's attempt to assert the union's unfair labor practice as a defense in a trustee collection suit has been rejected by the courts. *See, e. g., Lewis v. Splashdam By-Products Corp.*, 233 F.Supp. 47 (W.D.Va.1964). As that court noted:

it has been uniformly held that the courts are *not competent to find the commission of* an unfair labor practice and that they cannot give effect to such finding.

. . . .

The fact that this is a case in which an unfair labor practice is sought to be recognized as creating a legal defense rather than a case in which relief is affirmatively sought to remedy the consequences flowing from an unfair labor practice would not detract from the applicability of the rationale of these cases to the facts before us.

*Id.* at 51.

*Corp.; Lewis v. Mill Ridge Coals, Inc.;* and *Huge v. Long Hauling Company, Inc.* Cases such as *Western Washington Laborers-Employers Health and Security Trust Fund v. McDowell* and *Washington Area Carpenters Welfare Fund, et al. v. Overhead Door Company* are considered to have been incorrectly decided and this legislation is intended to clarify the law in this respect by providing a direct, unambiguous ERISA cause of action to a plan against a delinquent employer.

126 Cong. Rec. H7899 (daily ed. August 26, 1980) (remarks of Rep. Thompson) (citations omitted). Thus, in our view, the relevant principles of law, equitable considerations, and congressional intent require decision in favor of the plaintiff Trustees.

\* \* \* \* \* \*

■ Although we believe that we have correctly disposed of the defendant's contention, there is an alternative basis for our decision. We conclude that, even if *Higdon* is properly applied to trustee collection suits, it would not bar the present action. In its opinion in *Higdon*, the Supreme Court adopted the NLRB's position that, until the union achieves majority status, "the prehire agreement is *voidable* and does not have the same stature as a collective bargaining contract . . . ." *Higdon*, 434 U.S. at 341, 98 S.Ct. at 655 (emphasis added). In our view, the most expansive permissible reading of the Court's opinion is, therefore, that a pre-hire agreement is voidable by the employer until the signatory union achieves majority status in the employer's work force. Until the employer repudiates the agreement, it is enforceable. *See Florida Marble Polishers Health and Welfare Trust Fund v. Megahee*, 87 CCH Lab.Cas. ¶ 11,735 (M.D.Fla. 1979). Any other conclusion would, in our view, render null and void contracts specifically sanctioned by Congress in enacting section 8(f), a result that would contravene elementary principles of statutory construction and defy common sense.[11]

■ In order to repudiate his obligations under a prehire agreement, an employer must either comply with the termination provision of the agreement, if any, or give notice to the union sufficient to make manifest his intent to terminate the agreement.[12] Whether sufficient notice has been given by the party wishing to terminate the agreement is a question of fact to be determined by examining the totality of the parties' conduct. As one district court recently said in deciding the same issue presented here, there must be

> a sufficient affirmative act to warrant a conclusion that the contract had been declared void and unenforceable from that date on so that the union trust fund would be on notice that it was not to be responsible for covering the employees from whom contributions were not received.

11. The settled rule of contract construction, that contract language not be interpreted so as to render the contractual promise illusory or meaningless, applies with equal force to labor contracts. *See Retail Clerks International Association Local No. 455 v. NLRB*, 510 F.2d 802 (D.C.Cir.1975).

12. Ordinarily, a labor contract which does not specify its duration or provide for termination is terminable at will upon reasonable notice to the other party. *Boeing Airplane Co. v. NLRB*, 174 F.2d 988 (D.C.Cir.1949). The NLRB has said,

> [t]he word "terminate" has a somewhat different meaning in labor contracts from that which it holds in other commercial contexts. The relationship between the employer and the bargaining representative is a continuing one . . . . Respondent, in its memorandum agreement, agreed to be bound by the results of a continuing collective-bargaining relationship between the Union and AGC. . . . Respondent either continued to be bound by the results of the negotiations between the Union and the AGC, or was obligated to give proper notice to the Union that it no longer intended to be so bound. Having failed to give any notice to the Union that it desired to cease giving effect to the memorandum agreement, Respondent is estopped from now asserting that it is not bound.

*Ted Hicks & Associates, Inc.*, 232 NLRB 712, 714 (1977). When one party desires to terminate a collective bargaining agreement which contains no expiration date, section 8(d) of the Act, 29 U.S.C. § 158(d), requires that written notice be given to the other party at least sixty days prior to the proposed termination. However, section 8(d) has been held inapplicable to prehire agreements which do not have the stature of collective bargaining agreements. *See Eastern District Council*, 457 F.Supp. at 830.

*Florida Marble Polishers Health and Welfare Trust Fund v. Megahee,* 87 CCH Lab. Cas. at 22,939. In this case, we have already noted that "there is considerable, if not compelling, evidence that by defendant's conduct and actions the agreement endured . . . to as late as February, 1979 . . . ." Order of June 26, 1980 at n.1.

\* \* \* \* \* \*

In conclusion, we find that the agreement between the parties imposes an enforceable obligation on the defendant Southern Stress Wire Corporation. The plaintiff Trustees are, therefore, entitled to recover the delinquent contributions due the Fringe Benefits Funds.

Accordingly, the defendant Southern Stress Wire Corporation is ORDERED to make available to the plaintiff Trustees such records as may be necessary for an audit to determine the amount due under the agreement. The plaintiff Trustees are ALLOWED sixty (60) days from the date of this order to submit to this court such motions, which shall include a summary of said audit, as may be necessary finally to dispose of this case.

IT IS SO ORDERED.